969 A.2d 989

**Anthony Loyd MITCHELL**

v.

**STATE of Maryland.**

**No. 11 Sept.Term, 2008.**

Court of Appeals of Maryland.

April 16, 2009.

370

Bradford C. Peabody, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for Petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for Respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

GREENE, Judge.

This appeal arises from the trial, in the Circuit Court for Harford County, of Anthony Loyd Mitchell, the petitioner, for attempted murder and related offenses. During his closing argument, defense counsel called attention to certain potential witnesses that the State did not call. Defense counsel stated, among other things, that "the idea ... is to bring ... *all* the evidence into court" (emphasis added). According to defense counsel, some eyewitnesses did not testify, and Wali Henderson, whom the police initially thought was involved in the incident, as well as Mitchell's alleged accomplices, should have been present at trial. In response to these statements by defense counsel, the prosecutor remarked in rebuttal closing argument that both the State and the defense have the power to subpoena witnesses. The prosecutor then commented that "[the defense] had an equal right to present [the witnesses named by defense counsel] if [the defense] thought it would contradict something [the State] presented."

Mitchell contends, in this Court, that the prosecutor's remarks calling attention to the defendant's subpoena power improperly shifted the burden of proof. The State retorts, by contrast, that the prosecutor's remarks were justified, under either the "invited response" doctrine or "as a matter of fundamental fairness." (Resp.'s Br. 18). We conclude that the prosecutor's remarks, made during rebuttal closing argument, were not improper. Although defense counsel's closing argument did not invoke the "invited response" doctrine, his argument did "open the door" to the prosecutor's narrow and isolated remarks calling attention to Mitchell's subpoena power. Under the circumstances, the prosecutor's remarks did not shift the burden of proof.

## I

On June 4, 2004, a high school graduation party took place at the Harford Square Community Pool in the Edgewood neighborhood in Harford County. Approximately two to three hundred people attended the party, which was held in honor of the niece of Theodore Roosevelt Johnson, Jr. The complainants in this case, Aylesworth Johnson and Josh Barmer, served along with others as chaperones at the party.

At approximately 11:45 p.m., Theodore Johnson attempted to end the party because he was concerned about the large crowd that had gathered, and he expected trouble. At that time, the chaperones began preventing additional people from entering the party. Two men insisted on gaining admission, and a scuffle ensued between them and Aylesworth Johnson and Barmer. Aylesworth Johnson grabbed the first man and pushed him away. The first man raised his T-shirt to reveal the butt of a handgun tucked in his waistband and shouted, "Nobody [sic] going to be putting their hands on me, nobody be putting their hands on me." He then began to fire shots into the air. The second man displayed a shotgun and fired towards the crowd, shooting both Aylesworth Johnson and Barmer. Theodore Johnson testified that the man with the shotgun, whom he described as "five-seven, five-eight," dark-

skinned, 190 to 200 pounds, and wearing brown clothing and a black hat, was Anthony Loyd Mitchell.

Theodore Johnson further testified that he thought the shooters sped away in a black Hummer that had been parked in the pool complex. Acting on this information, the police stopped a Hummer and detained its occupants, Wali Henderson[1] and Anthony Andoll. The police later decided that neither man was involved in the shooting.

Anthony Darryl Wood, Jr. attended the party. Wood made an in-court identification of Mitchell as the person who fired the shotgun at Aylesworth Johnson and Barmer. Wood also testified that the other gunman was Antonio Corprew and that Corprew used a handgun. Wood said that he was familiar with Mitchell and Corprew because he knew them from the neighborhood.

Wood further testified that as he drove away from the scene in his Chevrolet Impala, he encountered Mitchell, Corprew, and "two or three other guys," including Lewis "Man Man" Cochran, standing in the street. According to Wood, he slowed down to avoid hitting the men, who then jumped into Wood's car and told him to drive away. During the drive, Corprew became angry with Cochran, and Corprew fired his weapon.[2] The bullet missed Cochran and entered the passenger seat, where it became lodged.[3] Also left behind in Wood's car was a black hat that Wood testified belonged to one of his passengers.

---

1. In the record before us, Henderson's name is spelled both "Wally" and "Wali." For purposes of consistency, we shall use the latter spelling.

2. Wood testified that the men argued about why Mitchell and Cochran decided to "start shooting."

3. Wood later located the bullet in his car and disposed of it. Two days after the shooting, he contacted his friend Kevin Williams, a detective in Bel Air, who gave Wood the phone number to two detectives involved in the investigation. Wood met with the detectives and provided a statement consistent with the testimony he recounted in court.

Several hours after the shooting, police recovered a shotgun in the wheel well of a van parked near the Harford Square pool complex. Police were led to the van by Darnell Carter and Andre Chase. Carter told one of the officers that a "heavyset black guy stuck something up somewhere, you might want to go check it out. . . ." Chase told police that he heard gunshots and then "saw a heavyset black male, wearing all dark clothing, stoop next to the left front tire of the van. . . ."

Following the evening's events, Mitchell was indicted in the Circuit Court for Harford County. At Mitchell's trial, during opening statements, the prosecutor told the jury that it would hear from Antonio Corprew and Lewis Cochran, Mitchell's alleged accomplices. Specifically, the prosecutor stated:

> You will hear testify in this case Antonio Corprew, the one that fired the handgun into the air. He is now serving a sentence in the Division of Correction, and you'll hear about that in relation to this case. You'll also hear from a Lewis Cochran who was in the company of the defendant and Antonio Corprew. He also was prosecuted in this case and ended up pleading guilty to a lesser charge.

For whatever reason, neither Corprew nor Cochran testified at trial.

Defense counsel informed the jury during his opening statement that the State had the burden of proof. Defense counsel stated:

> Now, what about Mr. Mitchell's job? What does he have to do? Well, the judge has already told you. He doesn't have to do anything. . . . Because the State has the burden of proof. The State has the burden of proving him guilty beyond a reasonable doubt. Again, that is the State's burden, that is the State's obligation, and that is the law.

The State requested that the court issue a body attachment for Wali Henderson, the driver of the Hummer stopped by the police. After meeting with Henderson at the courthouse, however, the prosecutor decided not to call him as a witness

and asked the court to recall the body attachment.[4] Carter and Chase, the men who led police to the shotgun, did not testify either. Several police officers and investigators did testify, however. Among them, the State's firearms expert stated that the shotgun recovered from under the van was used to shoot Aylesworth Johnson and Barmer.

At the close of all the evidence, before closing arguments, the trial judge gave the jury its instructions as to the law governing the case. The jury instructions provided, in pertinent part, that "[t]he Defendant is presumed to be innocent of the charges" and that "[t]he State has the burden of proving the guilt of the Defendant beyond a reasonable doubt." In addition, the court informed the jury that opening statements and closing arguments are not evidence and that "[t]hey are intended only to help the [jurors] to understand the evidence and to apply the law." Moreover, the court stated to the jury:

> There are times when different inferences may be drawn from the facts, whether proved by direct or by circumstantial evidence. The State may ask you to draw one set of inferences, while the defense may ask you to draw another. It is for you, and for you alone, to decide what inferences you will draw from the body of evidence in this case.

During closing arguments, defense counsel called attention to the absences of Henderson, Corprew, Cochran, Carter, Chase, and Maurice Turner, who was listed as a potential witness in the State's proposed voir dire. Defense counsel stated:

> Now, obviously you saw me writing as much as I could during the course of the trial. I just have some basic questions. Now, we heard—or rather we never heard from Mr. Cochran, and I'm not sure who Mr. Cochran was. We never heard from Mr. Corprew, although there was mention of his name, and Mr. Turner also, but we never saw them. And that's important. We also never saw Wal[i]

---

4. The jury was neither informed of Henderson's presence at the courthouse nor that the body attachment was recalled.

Henderson. And I believe he was identified as the individual who was operating the Hummer. We never saw him.

I have written down here: We can't trust anybody else's ID, even though there were these other IDs, because we never know if the identifications were due to the photograph in the paper.[5]

We don't know whether Mr. Johnson—and I think some of the testimony was that the guy who placed the gun in the wheel well of the van was a heavyset guy, and I'm not sure what that means, but I would characterize Mr. Wood, the guy who was driving the getaway car, as a heavyset guy, but we don't know if Mr. Johnson ever saw Mr. Wood. And we'll never know what Mr. Johnson, Theodore Roosevelt Johnson, would have said had he seen Mr. Wood. We know there was [sic] a lot of people at the party, a lot of cars, a lot of vehicles, and then we heard information that there were some neighborhood children that gave information to Mr. Daryl Carter, and that led the deputies to the gun and the van. . . .

\* \* \* \*

Now, I already mentioned that we have a whole bunch of people who were not present during these proceedings; Corprew, Mr. Turner, Mr. Cochran, and, you know, Mr. Henderson, Mr. Chase, Mr. Carter. See, the whole idea, I would submit, the whole idea is for you, the jury, to evaluate the evidence. For you, the jury, to determine what happened. For you, the jury, to make sense of it all. So I think the idea is to bring, I submit, all the evidence into court. And with all the people, all the noise, with all the people that were there, clearly you have a situation where a misidentification could take place. They saw 350 people that night, and they saw them altogether, and it was nighttime, and then something really traumatic happened, and the mind is trying to compute what happened. Fine. But you have had the opportunity to step back from the excite-

---

5. Mitchell's picture appeared in *The Aegis,* a local Harford County newspaper.

ment. *Let's bring Wal[i] Henderson here so we can see if he's a heavyset, dark-skinned man. Let's bring Antonio Corprew here so we can gauge his stature. Let's look at Man–Man, what does he look like? Get that hat out of the car. Does that hat fit his head?*

(Emphasis added.)

At the conclusion of his closing argument, defense counsel again reminded the jury of the State's burden of proof:

Now, the prosecutor gets another opportunity to address you. And that's just the way it is, because the prosecution, the State, has the burden, and the prosecutor may indicate why the defense is wrong and how I'm blowing smoke and all that, and that's fine, but there's something I really want you to remember. This case is not about what the defense's position is. The issue is proof beyond a reasonable doubt. You each must be convinced. And don't forget one other thing [the trial judge] said: Each of you must decide the case for yourself. . . .

During rebuttal closing argument, the prosecutor stated:

The defense made mention a couple times about what the State didn't present to you all. We never saw Cochran, never saw Corprew, never saw Turner, never saw Wal[i] Henderson. . . .

As far as dealing with certain people that weren't here, the defense made a specific point. He said you all should have had a chance to look at them and see what they looked like. I don't quite understand what that was meant to indicate.

Defense counsel objected. The trial judge overruled the objection and the prosecutor continued: "The only thing I can gather is that [defense counsel] wanted to make some sort of inference that the State was holding back something." Defense counsel then requested to approach and the following discussion ensued at the bench:

[Defense Counsel]: Judge, it's my position that the State's Attorney is not allowed to suggest to the jury that since we

acknowledge these people, that we could have brought them in.

[Prosecutor]: That's exactly what I was going to do.

[Defense Counsel]: That shifts the burden from the State to the defense.

The Court: You generated the issue, [defense counsel]. You generated it in your remarks and he has a right to rebut your remarks.

[Defense Counsel]: That's still shifting the burden, Judge.

The Court: I don't think it's burden shifting. I think that you raised the issue of whether or not they should have been seen, and I don't think the mere rebuttal of saying that you had the opportunity also, if you thought it was that important, to have them seen, I don't think that shifts the burden. You opened the door for it and he's responding to it. I don't think you can open the door and require him to be silent on this issue.

[Defense Counsel]: No, I just—

The Court: You raised the issue of the burden.

[Defense Counsel]: Yeah, but what I'm saying—

The Court: If you raise it, you're stuck with it.

[Defense Counsel]: But we still don't have any burden.

The Court: I know you don't have a burden, but [the prosecutor] has a right to respond to your raising this issue of why they weren't here. He has the right to raise that.

[Defense Counsel]: So you're saying it's our fault they're not here?

The Court: It's your fault for raising it.

[Defense Counsel]: But that's implying to the jury that we have some burden to—

The Court: I understand what shifting the burden is, or I think I do, and maybe I'm wrong, and if I'm wrong the appellate courts can decide it, but I'm overruling your objection. You raised the issue.

[Defense Counsel]: Yes, sir.

After counsel departed from the bench, the prosecutor continued with his closing argument. In pertinent part, he stated:

If [defense counsel] thought that them being here would have shown that something we presented was so contradictory to something about them, he could have brought them in as well. The defense has subpoena power just like the State does. You can't say why didn't the State present a witness, when they had an equal opportunity to present it to you, and then try to say, well, it wasn't presented. They had an equal right to present it if they thought it would contradict something we presented.

Following closing arguments, the jury deliberated and found Mitchell guilty of two counts of attempted second degree murder, and one count each of carrying a deadly weapon openly with the intent to injure and reckless endangerment. Mitchell filed a motion for a new trial arguing, among other things, that the prosecution's statement in rebuttal closing argument shifted the burden of proof to the defense to disprove guilt. The court denied the motion and sentenced Mitchell to a total of fifty-five years' imprisonment.

Mitchell appealed his convictions to the Court of Special Appeals, which, in an unreported opinion, affirmed the judgments of the Circuit Court. The intermediate appellate court held that the prosecutor's comments were a "satisfactorily tailored 'invited response'" to defense counsel's "attempt to exploit weaknesses in the State's case." Mitchell then filed a Petition for Writ of Certiorari, which we granted. *Mitchell v. State*, 404 Md. 658, 948 A.2d 70 (2008). Mitchell's petition raises one question for our review: "Did the State's closing argument improperly shift the burden of proof?"

## II

### A

#### *The "Invited Response" Doctrine*

Mitchell contends that the prosecutor's remarks in rebuttal calling attention to the defendant's subpoena power

improperly shifted the burden of proof. In reply, the State responds that the prosecutor's remarks were justified, under either the "invited response" doctrine or "as a matter of fundamental fairness." (Resp.'s Br. 18). We first address the prosecutor's remarks under the "invited response" doctrine. In so doing, however, we must necessarily begin by discussing the scope of permissible closing argument.

This Court addressed the scope of permissible closing argument in *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974). We stated:

> As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way.... Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the prosecution produces.

*Wilhelm,* 272 Md. at 412, 326 A.2d at 714 (citations omitted); *see also Degren v. State,* 352 Md. 400, 429, 722 A.2d 887, 901 (1999) (noting "the general rule that attorneys are afforded great leeway in presenting closing arguments to the jury").

 Recognizing the broad scope of permissible closing argument, we have held that "[w]hat exceeds the limits of permissible comment or argument by counsel depends on the facts of each case." *Smith and Mack v. State,* 388 Md. 468, 488, 880 A.2d 288, 299–300 (2005). Because the trial judge is in the best position to gauge the propriety of argument in light of such facts, we have also held that "[a]n appellate court

should not disturb the trial court's judgment absent a clear abuse of discretion by the trial court of a character likely to have injured the complaining party." *Grandison v. State,* 341 Md. 175, 225, 670 A.2d 398, 422 (1995); *see Henry v. State,* 324 Md. 204, 231, 596 A.2d 1024, 1038 (1991) (noting that "[t]he inference of any impropriety occurring in closing arguments 'must of necessity rest largely in the control and discretion of the presiding judge' " (quoting *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15)). Nevertheless, we have acknowledged certain boundaries that counsel may not exceed in delivering his or her closing argument. For instance, counsel may not "comment upon facts not in evidence or . . . state what he or she would have proven." *Smith and Mack,* 388 Md. at 488, 880 A.2d at 299. It is also improper for counsel to appeal to the prejudices or passions of the jurors, *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316, 320 (1949), or invite the jurors to abandon the objectivity that their oaths require, *Lawson v. State,* 389 Md. 570, 594, 886 A.2d 876, 890 (2005).

██ Grounded in the idea that the scope of permissible closing argument is quite broad, and the attendant rule that the propriety of closing argument must be judged contextually, on a case-by-case basis, is the "invited response" doctrine. *Lee v. State,* 405 Md. 148, 163, 950 A.2d 125, 134 (2008). In *Lee,* a recent case, we defined the "invited response" doctrine as follows: " 'where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial.' " 405 Md. at 163–64, 950 A.2d at 137 (quoting *Spain v. State,* 386 Md. 145, 157 n. 7, 872 A.2d 25, 32 n. 7 (2005)).

██ The Supreme Court of the United States has also addressed the "invited response" doctrine. In *United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1, 11 (1985), the Court stated:

In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's

opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

Thus, from *Lee* and *Young* it is evident that the "invited response" doctrine applies only when defense counsel first makes an improper argument. *See, e.g., Lee,* 405 Md. at 169, 950 A.2d at 137 ("[B]ecause the 'invited response doctrine' calls for the prosecutor's invited response to be considered in context with the defense counsel's own impropriety, it is not applicable when defense counsel has made no improper argument.").[6]

■ An improper argument by defense counsel sufficient to invoke the "invited response" doctrine is one that goes outside the scope of permissible closing argument and "invite[s] the jury to draw inferences from information that was not admitted at trial." *Lee,* 405 Md. at 166, 950 A.2d at 135. In *Young,* during closing argument, defense counsel repeatedly attacked the integrity of the prosecution, "charg[ing it] with 'reprehensible' conduct in purportedly attempting to cast a false light on [the defendant's] activities." 470 U.S. at 4, 105 S.Ct. at 1041, 84 L.Ed.2d at 6. The Court held that defense counsel's conduct was sufficient to invoke the "invited response" doctrine because "[d]efense counsel ... must not be permitted to make unfounded and inflammatory attacks on the opposing advocate." *Young,* 470 U.S. at 9, 105 S.Ct. at 1043, 84 L.Ed.2d at 8; *see also United States v. Robinson,* 485 U.S. 25, 33 n. 5, 108 S.Ct. 864, 869 n. 5, 99 L.Ed.2d 23, 32 n. 5 (1988) (opining that, under *Young,* a prosecutor's reference to a criminal defendant's failure to testify may be contextually proper); *United States v. Nickens,* 955 F.2d 112, 121–22 (1 st Cir.1992) (holding that defense counsel's argument that the prosecution was

---

**6.** *See also* Bruce J. Berger, *The Prosecution's Rebuttal Argument: The Proper Limits of the Doctrine of "Invited Response,"* 19 Crim. L. Bull. 5, 7 (1983) (noting that courts often invoke the "invited response" doctrine erroneously, to allow a prosecutor to rebut an entirely proper defense argument).

trying to "railroad" his client was sufficient to invoke the "invited response" doctrine).

This Court has not yet had the opportunity to address an improper argument by defense counsel sufficient to invoke the "invited response" doctrine. In *Lee*, involving a handgun assault, the defendant called the victim to the stand. 405 Md. at 154, 950 A.2d at 128. The victim testified that the defendant did not shoot him; nor did the victim recount any prior altercation with the defendant. *Id.* During his closing argument, defense counsel commented that the testimony of the State's only eyewitness was unreliable because it had changed over time, and that the jury instead should believe the testimony of the victim, whom the State did not call because " '[h]e didn't prove their case.' " *Lee*, 405 Md. at 155, 950 A.2d at 129. The prosecutor then responded in rebuttal closing argument that the jurors should not believe the victim because he was following "the law of the streets. . . ." *Lee*, 405 Md. at 156, 950 A.2d at 130. We held that defense counsel's argument regarding the veracity of the victim's testimony was not improper, and, therefore, the prosecutor's "law of the streets" argument could not be justified under the "invited response" doctrine. *Lee*, 405 Md. at 170, 950 A.2d at 138; *see also Johnson v. State*, 325 Md. 511, 519, 601 A.2d 1093, 1097 (1992) (determining that the prosecutor's improper remarks in rebuttal closing argument could not be justified because defense counsel's closing argument was not improper).

In the instant case, like in *Lee*, defense counsel's closing argument was insufficient to invoke the "invited response" doctrine. Maurice Turner was listed as a potential witness in the State's proposed voir dire, and the prosecutor acknowledged in his opening statement that the jury would hear from Mitchell's alleged cohorts Antonio Corprew and Lewis "Man–Man" Cochran. In addition, the jury heard about Wali Henderson, the driver of the Hummer, an initial suspect in the shooting, and the jury also learned of Darnell Carter and Andre Chase, the two men who led police to the shotgun. Because it is within the scope of permissible closing

argument for counsel to draw inferences from the evidence admitted at trial, which includes the ability to comment on an absence of such evidence, defense counsel's closing argument was not improper. *See Eley v. State,* 288 Md. 548, 553, 419 A.2d 384, 386–87 (1980) (holding that defense counsel may call attention to the State's failure to produce evidence); *Wise v. State,* 132 Md.App. 127, 146, 751 A.2d 24, 33 (2000) (recognizing "the right of a defendant to comment upon the failure of the State to produce evidence"), *cert. denied,* 360 Md. 276, 757 A.2d 811 (2000); *Eastman v. State,* 47 Md.App. 162, 167, 422 A.2d 41, 43 (1980) (noting that "it is not unreasonable to permit the defense to comment upon the State's shortcomings in producing prosecutorial evidence").

Further, the State contends that defense counsel's closing argument was improper, and therefore sufficient to invoke the "invited response" doctrine, because it made an impermissible "missing witness" inference. In other words, according to the State, defense counsel's closing argument drew the inference that witnesses not called by the State would have testified unfavorably to the prosecution. We addressed the propriety of a missing witness inference in *Davis v. State,* 333 Md. 27, 633 A.2d 867 (1993), stating:

"The failure to call a material witness raises a presumption or inference that the testimony of such person would be unfavorable to the party failing to call him, but there is no such presumption or inference where the witness is not available, or where the testimony is unimportant or cumulative, or where he is equally available to both sides."

*Davis,* 333 Md. at 48, 633 A.2d at 877 (quoting *Christensen v. State,* 274 Md. 133, 134–35, 333 A.2d 45, 46 (1975)). In addition, we noted that

[t]he missing witness inference may arise in one of two contexts. A party may request that a trial judge instruct the jury on the operation and availability of the inference where all the elements of the rule are present. Additionally, a

party may wish to call the jury's attention to this inference directly during closing arguments.

*Davis*, 333 Md. at 52, 633 A.2d at 879 (citations omitted).

In the instant case, generally, defense counsel mentioned in closing argument that the jury did not hear from Corprew, Cochran, Henderson, Chase, Carter, and Turner. By this argument, defense counsel pointed out that the prosecutor failed to call these potential witnesses. As to the significance of their absences, defense counsel indicated that the State's case was significantly weak on the issue of identification of Mitchell as the shooter. Specifically, according to defense counsel, the jury was never given an opportunity to see and compare for themselves whether certain of these witnesses corresponded to the descriptions of the suspects in the case.[7] As such, Defense counsel stated, in closing argument:

---

7. This case is unlike the case of *Christensen v. State*, 274 Md. 133, 333 A.2d 45 (1975). In *Christensen*, defense counsel requested an instruction that there was no duty on the defendant's part to produce the alleged accomplice and that no inference should be drawn from the fact that the accomplice was not produced. 274 Md. at 136, 333 A.2d at 47. The court denied the instruction. *Id.* The prosecutor then argued to the jury that an inference should be drawn from the defendant's failure to call the accomplice to testify. *Christensen*, 274 Md. at 138–39, 333 A.2d at 48. Here, however, the prosecutor did not argue to the jury that an inference should be drawn from the defendant's failure to call his accomplices to testify. The prosecutor remarked only that Mitchell had the power to subpoena witnesses, and that the defense could do so "if they thought it would contradict something [the State] presented." In light of defense counsel's earlier statements that "clearly you have a situation where a misidentification could take place," and that the jury should be able to see Corprew, Cochran, and Henderson in the courtroom, the prosecutor's remarks did not relate to the substance of those witnesses' potential testimonies.

Had the prosecutor inferred that Corprew, Cochran, and Henderson would have testified unfavorably to the defense, that inference might well have conflicted with *Christensen*, 274 Md. at 140–41, 333 A.2d at 49 (holding that an adverse inference cannot be drawn from a defendant's failure to call a witness, if the State's evidence establishes that the witness is an accomplice who would be entitled to assert a Fifth Amendment privilege). Nevertheless, we conclude that the prosecutor's rebuttal argument did not go so far, and we note that defense counsel never asked the trial judge to draw a distinction between Mitchell's ability to have the jury see Corprew, Cochran, and

Now, we heard—or rather we never heard from Mr. Coch-ran, and I'm not sure who Mr. Cochran was. We never heard from Mr. Corprew, although there was mention of his name, and Mr. Turner also, but we never saw them. And that's important. We also never saw Wal[i] Henderson. And I believe he was identified as the individual who was operating the Hummer. We never saw him.

\* \* \* \*

[C]learly you have a situation where a misidentification could take place.... Let's bring Wal[i] Henderson here so we can see if he's a heavyset, dark-skinned man. Let's bring Antonio Corprew here so we can gauge his stature. Let's look at Man–Man, what does he look like? Get that hat out of the car. Does that hat fit his head?

To be certain, defense counsel did not infer that Corprew, Cochran, Henderson, Chase, Carter, and Turner would have testified unfavorably to the prosecution. Rather, defense counsel argued to the jury the sufficiency of the State's evidence, pointing to gaps in the State's case—notably a failure to corroborate the identification of Mitchell—and con-tending that additional evidence was necessary. Clearly, de-fense counsel suggested that the State needed to produce more witnesses to prove its case against Mitchell, thereby implying that every witness, whether material or not, no matter how cumulative the evidence might be, should have been heard or seen. Such an argument is not tantamount to an improper missing witness inference and does not invoke the "invited response" doctrine.

In response to defense counsel's argument, the prosecutor did not contend that defense counsel inferred that any wit-nesses that were not called would have testified unfavorably to the State. Instead, the prosecutor stated that the inference drawn by defense counsel was "that the State was holding back something." An inference that the State is "holding

---

Henderson and Mitchell's inability to present the testimony of an alleged accomplice.

back" does not amount to a statement that witnesses not called by the State would have testified unfavorably to the prosecution. A party may have any number of reasons to "hold back" and not call a potential witness. For instance, the witness's testimony might be cumulative, or the existence of impeaching evidence may detract too greatly from the probative value of the testimony and taint the party's case.

## B

### *The "Opened Door" Doctrine*

Although we hold that the "invited response" doctrine is inapplicable, because defense counsel did not make an improper argument and no impermissible missing witness inference was made, our analysis does not end here. The State contends that several federal court cases and cases from other jurisdictions support its position that the "invited response" doctrine applies and that Mitchell's convictions ought to be affirmed. *See, e.g., United States v. Hernandez,* 145 F.3d 1433, 1439 (11th Cir.1998) (holding that it is not improper for a prosecutor to comment on a defendant's subpoena power, " 'particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness' " (quoting *United States v. Blackman,* 66 F.3d 1572, 1578 n. 7 (11th Cir.1995))); *United States v. Molovinsky,* 688 F.2d 243, 247 (4th Cir.1982) (holding that prosecutor's remarks regarding the defendant's subpoena power were "a justified defensive response"); *accord People v. Kliner,* 185 Ill.2d 81, 235 Ill.Dec. 667, 705 N.E.2d 850, 886 (1998); *Doby v. State,* 557 So.2d 533, 539–40 (Miss.1990). None of those cases, however, mention the "invited response" doctrine as we have defined it; thus, the State's reliance is misplaced. Instead, the cases cited support another one of the State's assertions, that is, that fundamental principles of fairness permitted the prosecutor to call attention to Mitchell's subpoena power. We agree with that assertion, which we also find supported by our own cases, and hold that defense counsel's closing argument "opened the door" to the prosecutor's remarks about Mitch-

ell's subpoena power. We, therefore, consider the prosecutor's remarks to be fair comment.

■ The "opened door" doctrine is based on principles of fairness and permits a party to introduce evidence that otherwise might not be admissible in order to respond to certain evidence put forth by opposing counsel. *Conyers v. State,* 345 Md. 525, 545, 693 A.2d 781, 790 (1997). " '[O]pening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue.' " *Clark v. State,* 332 Md. 77, 85, 629 A.2d 1239,- 1243 (1993); *see also* McLain, Maryland Evidence, § 103:13(c)(i) ("If one party has introduced irrelevant evidence, over objection, or, indeed, even 'admissible evidence which generates an issue,' the trial court may rule that the first party has 'opened the door' to evidence offered by the opposing party that previously would have been irrelevant, but has become relevant."). We have held that the opened door doctrine applies in the context of opening statements, *see Terry v. State,* 332 Md. 329, 337, 631 A.2d 424, 428 (1993) (noting that, although the opening statement is not evidence, "the general principles involved in allowing a party to 'meet fire with fire' are applicable"), and we see no reason why it should not apply in the context of closing arguments as well.[8]

Here, as we have noted, defense counsel, in closing argument, permissibly drew the jury's attention to the absences of Wali Henderson, Antonio Corprew, Lewis "Man–Man" Cochran, and others. By saying "Let's bring Wal[i] Henderson," Corprew, and "Man–Man" into the courthouse, however, defense counsel argued the relevancy of their absences and the

---

8. The Court of Special Appeals has long recognized that the "opened door" doctrine applies to closing arguments. For example, in *Booze v. State,* 111 Md.App. 208, 224, 681 A.2d 534, 541 (1996), *rev'd on other grounds,* 347 Md. 51, 698 A.2d 1087 (1997), defense counsel, in closing argument, referred to testimony from a prior trial of the defendant. Thereafter, during rebuttal argument, the prosecutor also referenced that trial. *Booze,* 111 Md.App. at 224, 681 A.2d at 541. Although noting that the defendant did not preserve the issue for review, the intermediate appellate court stated that defense counsel "opened the door" to the prosecutor's rebuttal. *Id.*

weakness in the State's case. This maneuver "opened the door" for the prosecutor to offer an explanation as to why those witnesses were not present. *See Degren,* 352 Md. at 433, 722 A.2d at 903 ("[P]rosecutors may address during rebuttal issues raised by the defense in its closing argument."). Moreover, defense counsel's choice of language in stating "Let's bring Wal[i] Henderson," Corprew, and "Man–Man" into the courthouse for inspection associated the jurors with the defense, as if the jurors were entitled to see these witnesses and somehow were prevented from doing so by the State. In light of such language, a response by the prosecutor calling attention to Mitchell's subpoena power was fair comment.

Accordingly, our holding in regard to the State's rebuttal argument is a narrow one. The prosecutor's remarks calling attention to the defendant's subpoena power were a tailored response to defense counsel's assertion that all the potential witnesses should have been brought into the courtroom given what defense counsel identified as a weakness in the State's case. Indeed, in response to defense counsel's assertion that Mitchell faced a case of misidentification, the prosecutor responded as follows:

> The defense made mention a couple of times about what the State didn't present to you all. We never saw Cochran, never saw Corprew, never saw Turner, never saw Wal[i] Henderson. . . .

> \* \* \* \*

> As far as dealing with certain people that weren't here, the defense made a specific point. He said you all should have had a chance to look at them and see what they looked like. . . .

> \* \* \* \*

> If [defense counsel] thought that them being here would have shown that something we presented was so contradictory to something about them, he could have brought them in as well. The defense has subpoena power just like the State does. You can't say why didn't the State present a

witness, when they had an equal opportunity to present it to you, and then try to say, well, it wasn't presented. They had an equal right to present it if they thought it would contradict something we presented.

Cases from other courts that the State has called to our attention support our conclusion that a prosecutor may comment on the defendant's subpoena power after defense counsel has "opened the door." In *Hernandez, supra,* defense counsel first brought up the defendant's subpoena power. 145 F.3d at 1436. Defense counsel argued in closing, "Now I will suspect the government will say ... [the defendant] has the subpoena power." *Id.* During rebuttal, the prosecutor stated:

It is much easier to raise questions than it is to answer [them], folks, isn't it? It is much easier to raise questions. [Defense counsel] starts first with where is the confidential informant? Well, where was the confidential informant? Remember Special Agent Greene told you the informant was not too confidential to Ms. Short [defense counsel] because she met the informant before.

*Hernandez,* 145 F.3d at 1437.

On appeal, Hernandez argued that the prosecutor's rebuttal argument shifted the burden of proof to the defense. *See Hernandez,* 145 F.3d at 1438 ("Hernandez contends that the prosecutor, in his rebuttal argument, created a non-existent relationship between the confidential informant and defense counsel which left the jury with the impression that defense counsel had an equal if not elevated duty to use its subpoena power to produce the informant at trial."). The court rejected this argument, stating that "it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, 'particularly when done in response to a defendant's argument about the prosecution's failure to call a specific witness.'" *Hernandez,* 145 F.3d at 1439 (quoting *Blackman,* 66 F.3d at 1578 n. 7).

In *Molovinsky, supra,* one of the defendant's alleged co-conspirators, Ed Sparrow, was present in the courthouse throughout the trial. 688 F.2d at 247. The government never

called Sparrow to testify, and defense counsel commented in closing argument as follows:

> [I]t is clear from the evidence that Sparrow was as heavily involved, subsequently, in trying to find a way of counterfeiting as the defendant was. He is not here; he did not testify. He is not on trial. He is not charged. He did not testify. You cannot speculate on what his testimony might have been, but you can note his absence and ask yourself whether or not, given all the factors in this case— whether or not the Government has really proven to your satisfaction, beyond a reasonable doubt, given that they do not call the co-conspirator in, that there was an agreement to counterfeit. . . .

*Molovinsky,* 688 F.2d at 247–48 (alterations in original). The prosecutor then replied in rebuttal argument:

> Now where was Ed Sparrow? I have a sneaking suspicion that Gale Molovinsky knows his address and phone number. The law provides him subpoena power. Do you think it is possible that Mr. Molovinsky might not have wanted you to hear Mr. Sparrow's version of what went on? Ladies and gentlemen, he [Sparrow] was at least as available to the defense as he was to the Government.

*Molovinsky,* 688 F.2d at 247 (alteration in original). The court held that the prosecutor's response was proper in light of the argument made by defense counsel. *Molovinsky,* 688 F.2d at 247–48.

In *Doby, supra,* defense counsel cross-examined an officer about the whereabouts of a confidential informant. 557 So.2d at 538. During closing argument, the prosecutor rekindled the discussion, stating that "[t]he State has the power of subpoena. So does defense counsel. You didn't see anybody subpoena him, did you?" *Id.* In holding that the prosecutor's statements were not improper, the Supreme Court of Mississippi stated:

> [W]here opposing counsel *"opens the door,"* the prosecution may enter and develop a matter in greater detail. . . .

\* \* \* \*

Moreover, a fair reading of th[e] cross-examination does indeed find the defense suggesting that the prosecution was up to something in its failure to have the confidential informant present. We may not in fairness hold the prosecution unable to answer.

*Doby*, 557 So.2d at 539–40 (emphasis added).

## C

### Shifting the Burden of Proof

In holding that the prosecutor's remarks calling attention to Mitchell's subpoena power were a narrow and isolated, justified response to defense counsel's "opening the door," we conclude that such remarks did not shift the burden of proof. Thus, our prior statement in *Eley*, 288 Md. 548, 419 A.2d 384, is inapposite. In *Eley*, we noted that

[a prosecutor's] comment upon the defendant's failure to produce evidence to refute the State's evidence ... might well amount to an impermissible reference to the defendant's failure to take the stand. Moreover, even if such a comment were not held tantamount to one that the defendant failed to take the stand it might *in some cases* be held to constitute an improper shifting of the burden of proof to the defendant.

288 Md. at 555 n. 2, 419 A.2d at 388 n. 2 (emphasis added). *But see, e.g., United States v. Williams*, 990 F.2d 507, 510 (9th Cir.1993) (holding that the prosecutor's comment regarding the defendant's failure to call a potential witness did not shift the burden of proof because it did not implicate the defendant's Fifth Amendment right not to testify); *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988) ("[C]ommenting on a defendant's failure to call a witness does not have the effect of shifting the burden unless it taxes the exercise of the defendant's right not to testify....").

Even if the prosecutor's remarks were improper, such that *Eley* applied, an analysis of Mitchell's "burden-shifting" argument in context, as our case law requires, would also mandate the conclusion that the prosecutor's remarks in rebuttal argu-

ment could not have shifted the burden of proof. *See Wilhelm,* 272 Md. at 436, 326 A.2d at 727; *see also Woodland v. State,* 62 Md.App. 503, 516–17, 490 A.2d 286, 293 (1985) (applying a contextual analysis to a burden-shifting argument), *cert. denied,* 304 Md. 96, 497 A.2d 819 (1985). Here, during his opening statement and closing argument, defense counsel emphasized to the jury that it was the State's burden to prove the defendant's guilt. More importantly, the court carried out its function and instructed the jury as to the burden of proof. Moreover, immediately preceding counsel's closing arguments, the court noted to the jury that such arguments are not evidence and that the jury was entitled to draw any reasonable inference from the evidence, and not just the inferences that counsel asked them to draw.

Under the circumstances, the prosecutor's remarks during rebuttal argument constituted a reasonable reply to arguments made by defense counsel in closing argument. The trial judge did not abuse his discretion in allowing the State's rebuttal argument, and the trial judge's ruling did not unfairly prejudice Mitchell or shift to him the burden of proof.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**

BELL, C.J., dissents and files opinion joined by JOHN C. ELDRIDGE, J., Retired Specially Assigned.

Dissenting Opinion by BELL, Chief Judge, which JOHN C. ELDRIDGE, J., Retired Specially Assigned, joins.

"It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368, 375 (1970). "It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with the utmost certainty." *Id.* at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375. In the present case, counsel for Anthony Loyd

Mitchell, the petitioner, did nothing more in closing argument than argue that the State failed to meet its burden of proof. That, in the process, he commented on the absence of witnesses, some of whom the prosecutor promised in opening statement would be presented at trial, does not change this basic fact or provide any basis for the argument the State was permitted to make in this case [1].

## I.

The prosecutor gave an opening statement at the onset of Mitchell's trial, in which he laid out the State's theory of the case. In that regard, he stated, in pertinent part:

*"With the defendant at the time [of the shooting] was another individual you'll hear about during the course of*

---

1. While I agree with the majority's holding that the "invited response" doctrine is inapplicable in the case *sub judice, Mitchell v. State,* 408 Md. 368, 373, 969 A.2d 989, 992 (2009), I disagree with its conclusion that the defense counsel's closing argument "opened the door," id., to the prosecutor's remarks concerning Mitchell's subpoena power.

The Court of Special Appeals has held that, "Maryland prosecutors, in closing argument, may not routinely draw the jury's attention to the failure of the defendant to call witnesses, because the argument shifts the burden of proof." *Wise v. State,* 132 Md.App. 127, 148, 751 A.2d 24, 34 (2000). The intermediate court went on to discuss an instance where it is proper for the prosecution to make such a comment, saying:
"On the other hand, *a defense attorney's promising in opening statement that the defendant will produce evidence and thereafter failing to do so does open the door to the fair comment upon that failure,* even to the extent of incidentally drawing attention to the defendant's exercising a constitutional right not to testify."
*Id.* at 148, 751 A.2d at 34–35 (emphasis added). In the present case, the defense did not indicate in its opening statement that witnesses would be produced and then fail to call them. The State did. This case is not about whether the defense opened the door to the prosecution's comments regarding Mitchell's subpoena power, in any event. It concerns, rather, whether or not the State has met the burden of proof that it has in this and every criminal case. I submit that it did not. Mitchell did nothing more in closing argument than point out evidence that the State failed to present. Such an argument does not open the door to an argument that at best, is tangential, and, at worst, impermissibly shifts the burden of proof to the defendant. The defense is allowed to comment on the State's failure to produce promised witnesses, just as the State is allowed to comment on the defendant's failure to produce witnesses promised in opening statement.

*the trial, one Antonio Corprew.* Mr. Corprew had a hand-
gun, and right before the shotgun was fired by the defen-
dant, one of the two adults saw Corprew going for his dip,
which is a slang term for going for a handgun stuck down
by the belt. Corprew, the witnesses indicated, began to fire
shots into the air or toward the air, and it was at this time
that the defendant was firing directly at the two victims.

\* \* \* \*

"Once the shooting stopped and the two victims lay on the
ground bleeding and in pain, the defendant, the Corprew
individual, and a couple of the other individuals that were
with them, we believe that it was four or five altogether,
then ran off up to one of the streets over in the Harford
Square development. . . .

*"You will hear testify in this case Antonio Corprew,* the one
that fired the handgun into the air. He is now serving a
sentence in the Division of Correction, and you'll hear all
about that in relation to this case. *You'll also hear from a
Lewis Cochran* who was in the company of the defendant
and Antonio Corprew. He also was prosecuted in the case
and ended up pleading guilty to a lesser charge. So you'll
hear from them. *You'll also hear from several other indi-
viduals who were present at this incident, some of which
will be able to testify that they actually saw the defendant
firing the shotgun toward the victims, and others who can
merely put him at the scene."*

(emphasis added).

The State made clear in its opening statement the impor-
tance of the testimony of Antonio Corprew and even Lewis
Cochran to the proof of its case. According to the prosecutor,
Corprew and Cochran were present at the time the crimes
were committed and, indeed, Corprew himself was involved
with Mitchell in the commission of the crimes. In that regard,
it was significant that the prosecutor pointed out that Corprew
was serving a period of incarceration as a result of the charges
in this case and that Cochran had pled guilty to criminal
charges, albeit lesser charges, stemming from this case. It is

significant as well that the State also promised to present several other individuals, who either were eyewitnesses to the shooting or could place Mitchell at the scene.

Counsel for the petitioner made no such promises. Instead, in his opening statement, he summarized the allocation of the burden of proof, pointing out the responsibility that each party has. Thus, counsel advised the jury, in pertinent part:

> "Now, what about Mr. Mitchell's job? What does he have to do? Well the judge has already told you. He doesn't have to do anything. He doesn't have to prove he didn't do it. He doesn't have to prove that he is not guilty. He doesn't have to prove that he's innocent. Because the State has the burden of proof. The State has the burden of proving him guilty beyond a reasonable doubt. Again, that is the State's burden, that is the State's obligation, and that is the law."

After counsel made their respective opening statements, the trial ensued. The State presented several witnesses, including Deputies Gregory Young and James Tsompanas, who were patrolling the area when they heard shots fired and responded to the scene. Neither saw the shooting and, so, did not testify that they saw the shooters. Deputy Young did indicate that he stopped a black Hummer that he had been told was involved in the incident.[2] Deputy Young identified the occupants of the Hummer as Wally Henderson and Anthony Sylvester Andoll, whom he held at gunpoint. He testified that they were subsequently determined not to be suspects and released.

Theodore Johnson also testified at trial. He identified Mitchell as the man who fired the shotgun and also testified that there was another shooter present with Mitchell.

---

2. Theodore Johnson, an uncle of the honoree of the party and a chaperone, testified that he believed the shooters fled in the Hummer, and that he yelled for the Hummer to be stopped.

Josh Barmer, one of the victims in the case, testified that he did not know where the shot that injured him came from. Barmer, too, indicated that there was more than one shooter.

Aylesworth Johnson, the other victim in the case and the brother of the honoree of the party, testified that he got into a shoving match with a young guy who was trying to enter the party and that the young guy lifted his shirt to reveal a gun stuck inside his trousers. Immediately thereafter, he continued, he was hit by a gunshot. Aylesworth Johnson stated, "I have no idea where that shot came from. I was looking at the gentleman in front of me with the handgun and then I hit the ground."

Anthony Daryl Wood, Jr. testified that he also was at the party on the evening of the shooting. He explained that, as he was leaving the party, he heard loud noises and saw a confrontation between four or five people. Wood recalled hearing gunshots and, responding to the prosecutor's inquiry whether he saw who shot the victims, identified Antonio Corprew, someone he knew from school, and Mitchell[3], whom he had known from the neighborhood, as the two shooters. Wood testified that, when he left the scene, he encountered Corprew and Mitchell, along with some others and, when they jumped in his car and told him to drive toward Route 40, he gave them a ride. Incidentally, Wood reported that Corprew got into an argument with one of the passengers[4], fired a shot inside the vehicle, and then exited the car shortly after the other occupants jumped out and ran.

---

**3.** Wood testified that, although Mitchell's back was to him and he did not see Mitchell's hands, he concluded from Mitchell's stance when he saw him that he was shooting.

**4.** Wood testified on direct examination that he did not know the name of the passenger with whom Corprew argued but that he was nicknamed "Man–Man." On cross-examination by the defense, the suggestion was made that "Man–Man" was Lewis Cochran:

"[Defense Counsel]: ... you don't know Man–Man's real name, right?
"[Anthony Wood]: No.
"[Defense Counsel]: Could that be Lewis Lee Cochran?
"[Anthony Wood]: Could be."

The last witness presented by the State was Detective Eric Gonzalez of the Criminal Investigation Division, Major Crimes of the Harford County Sheriff's Department. Gonzales indicated that, of the possible three hundred attendees at the party where the shooting occurred, forty-two people were interviewed, with four of those interviewed providing substantial information as to what happened at the incident. In response to the question, "what other individuals have been charged in this case?", Detective Gonzales answered "Lewis Cochran and Antonio Corprew."

After the State rested its case, the defense presented one witness, Iris Nicole Scontion–Williams. Williams testified that she was a friend of Aylesworth Johnson and was waiting in her car to pick up her cousin when the shooting occurred. She did not testify that she saw the shooters, and, did not identify the shooters. She did testify that, when she spoke with him, Aylesworth Johnson did not tell her who had shot him.

The State did not call Antonio Corprew, Lewis Cochran, or Wally Lamar Henderson as witnesses, even though those individuals were mentioned throughout the State's case and during the testimony of the State's witnesses. Corprew was mentioned the most often.

In closing argument, the prosecutor argued that Mitchell should be convicted as charged and offered reasons therefor. Although he reiterated that Corprew and Cochran or "Man–Man" were present at the shooting and that Corprew was directly involved, he did not explain why he did not call the witnesses he promised in opening statement to call.

To be sure, the defense, in closing argument, commented on the absence of certain witnesses, the failure of the State to call certain witnesses, and invited the jury to take that into account. The manner in which counsel made those comments must be viewed in context. After lamenting the sad state of society where gun violence is prevalent, defense counsel stressed to the jury:

"... the only issue in this case, whether you are pro-gun, whether you're anti-gun, that doesn't matter, the only issue in this case is proof beyond a reasonable doubt."

Counsel then described the jury system as a protection for the individual, "the arm of the individual," that stands between the individual and wrongful prosecution by the government. The jury was told, "[y]ou are his insurance against oppression. You are his insurance against an unfair trial." Then directing the jury's attention once again to the reasonable doubt standard that it was required to apply in reaching its verdict, defense counsel questioned the State's case, noting and emphasizing the State's failure to call certain witnesses. He stated, in pertinent part:

*"Now, we heard—or rather we never heard from Mr. Cochran, and I'm not sure who Mr. Cochran was. We never heard from Mr. Corprew, although there was mention made of his name and Mr. Turner also, but we never saw them. And that's important. We also never saw Wally Henderson. And I believe that he was identified as the individual who was operating the Hummer. We never saw him."*

(emphasis added).

Defense counsel then implied to the jury that Theodore Johnson, one of the two eyewitnesses for the State, was mistaken in his identification of Mitchell as the shooter, based on a newspaper article which identified Mitchell as a suspect. Regarding this, counsel said, in pertinent part:

"[Theodore Johnson] specifically said that this was Antonio. I told him, the defense counsel told him, that his name was Anthony Mitchell. Suppose Mr. Johnson got everything mixed up? And suppose Mr. Johnson, in his desperation to make some sense of a horrific event, started to read and believe what he had seen in the newspaper? Have we ever heard of that happening before? The power of suggestion? Think about it."

As for the State's second and final eyewitness, Anthony Wood, the defense counsel questioned whether Wood's version

of events should be believed by the jury. Counsel forcefully argued to the jury that Wood's story that he was an innocent attendee at the party and was not involved in any way in the shooting, but only gave a ride to the shooters, was not credible and should not believed. Moreover, in an effort to discredit Wood's testimony, he questioned why Wood did not take Interstate 95 to 695, the most direct route to his home in Parkville from Edgewood, but instead drove down Pulaski Highway or Route 40. Counsel posited, on that point, "[i]t's like somebody going down the back road trying to hide something." The defense also emphasized the point that Wood discarded the bullet that was in the back of his car, instead of reporting the incident to the police immediately. The defense counsel then went on to question why certain evidence, including a baseball bat that was at the scene and a hat that was in the back of Anthony Wood's car, was not presented or analyzed for DNA by the State.

With regard to his earlier discussion concerning the missing witnesses, the defense counsel argued:

> "Now, I already mentioned that we have a whole bunch of people who were not present during these proceedings; Corprew, Mr. Turner, Mr. Cochran, and, you know, Mr. Henderson, Mr. Chase, Mr. Carter. See, the whole idea, I would submit, the whole idea is for you, the jury to evaluate the evidence. For you, the jury, to determine what happened. For you, the jury, to make sense of it all. So I think the idea is to bring, I submit, all the evidence into court. They saw 350 people that night, and they saw them all together, and it was nighttime, and then something really traumatic happened, and the mind is trying to compute what happened. Fine. But you have had the opportunity to step back from the excitement. Let's bring Wally Henderson here so we can see if he's a heavyset, dark-skinned man. Let's bring Antonio Corprew here so we can gauge his stature. Let's look at Man–Man, what does he look like? Get that hat out of the car. Does that hat fit his head?"

The defense finished his closing argument with a final thought for the jury to consider. He said, "[t]his case is not about what the defense's position is. The issue is proof beyond a reasonable doubt. You each must be convinced."

In rebuttal argument, the prosecutor stated, in pertinent part:

"The defense made mention a couple times about what the State didn't present to you all. We never saw Cochran, never saw, Corprew, never saw Turner, never saw Wally Henderson. He also made mention of some items of evidence that perhaps weren't shown or brought out in the case. . . . As far as dealing with certain people that weren't here, the defense made a specific point. He said that you all should have had a chance to look at them and see what they looked like. I don't quite understand what that was meant to indicate."

Over the defense's objection, the State continued:

"If [defense counsel] thought that [the absent witnesses] being here would have shown that something we presented was so contradictory to something about them, he could have brought them in as well. The defense has subpoena power just like the State does. You can't say why didn't the State present a witness, when they had an equal opportunity to present it to you, and then try to say, well, it wasn't presented. They had an equal right to present it if they thought it would contradict something we presented."

## II.

Mitchell's position is that the State failed to meet its burden of proof. "In view of the fact that the accused bears no burden of proof, but needs only to raise a reasonable doubt in the minds of the jury," *Foster v. State*, 297 Md. 191, 211, 464 A.2d 986, 996 (1983); *e.g., In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *State v. Evans*, 278 Md. 197, 206, 362 A.2d 629, 634 (1976); *State v. Grady*, 276 Md. 178, 181–82, 345 A.2d 436, 438 (1975), the comments of Mitchell's counsel are the equivalent of counsel arguing that

the State failed to prove its case, that the State did not produce sufficient evidence to prove Mitchell's guilt beyond a reasonable doubt. Certainly, no one would argue that an argument that the State failed to meet its burden of proof, using those precise terms, or their equivalent, would have been improper. That the identical argument was made in the way that it was in this case, albeit in different terms, substantively and logically, is, and should be, of no consequence.

How the State meets its burden of proof is critical. Here, the State charged Mitchell with attempted murder and other related offenses as a result of a shooting that occurred on the night of June 4, 2004. The prosecutor, in opening statement, said that he would call Corprew, Cochran, and others, whom he did not name, to prove that Mitchell was guilty. *See State v. Snowden*, 385 Md. 64, 96, 867 A.2d 314, 332 (2005)("The burden ... is on the State ... to prove its case through production of witnesses and evidence that conform to the U.S. Constitution and the Maryland Declaration of Rights.") (citation omitted). Specifically, the prosecutor said "[y]ou will hear testify in this case Antonio Corprew.... You'll also hear from a Lewis Cochran who was in the company of the defendant and Antonio Corprew." Regarding the eyewitnesses, the prosecutor said "[y]ou'll also hear from several other individuals who were present at this incident, some of which will be able to testify that they actually saw the defendant firing the shotgun toward the victims, and others who can merely put him at the scene." The State called some witnesses, but not those it mentioned by name or others whose testimony might have supported its theory of the defendant's guilt. See *Dorsey v. State*, 349 Md. 688, 707, 709 A.2d 1244, 1253 (1998)(" 'The burden of proving evidence on an issue means the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced. It is usually cast first upon the party who has pleaded the existence of the fact.' ")(quoting *McCormick on Evidence*, § 336 at 568 (4th Ed. 1992)). The State presented only two eyewitnesses and neither of those eyewitnesses included the witnesses the State promised to call in this case. It logically

would have followed that the State should have presented those individuals that were central to it proving its case. The failure of the State to call Corprew or Cochran after promising in opening statement to do so, or to offer an explanation as to why they were not called, provided the defense with the opportunity to comment on the State's failure to present those witnesses. Taking that opportunity was not only the appropriate thing for Mitchell's counsel to do, it was critical to ensuring that Mitchell received effective and competent representation, which is so necessary to a fair trial.

The presentation of witnesses is one way for the State to prove its case, although not the only way. In this instance, however, by promising to present their testimony in opening statement, the State made that testimony and thus the presence of Corprew and even Cochran important to its case. That importance was reinforced by its repeated references to them during the presentation of the State's case. The fact that they were not presented was significant, as counsel for the defense noted. There was no way for Mitchell to make his case that the State failed to meet its burden of proof, other than to point out evidence that the State did not present. *See Jonathan Wayne Eley v. State,* 288 Md. 548, 554, 419 A.2d 384, 387 (1980) ("While it is not incumbent upon the State to produce fingerprint evidence to prove guilt, nevertheless, where a better method of identification may be available and the State offers no explanation whatsoever for its failure to come forward with such evidence, it is not unreasonable to allow the defendant to call attention to its failure to do so.") Mitchell simply called attention to the State's failure to produce the witnesses it promised to present. Just because Mitchell presented one witness at trial does not give the State license to comment on other witnesses that the defense could, or the State believes it should, have presented.

I dissent. Judge ELDRIDGE joins in the views expressed herein.