REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1401

September Term, 2015

———————————————

ANTONIO W. JOHNSON

v.

STATE OF MARYLAND

———————————————

Kehoe,
Arthur,
Friedman,

JJ.

———————————————

Opinion by Kehoe, J.

———————————————

Filed: July 28, 2016

The Circuit Court for Baltimore City granted the State's motion for a mistral in its prosecution of Antonio W. Johnson on charges of first-degree murder and related crimes. Johnson then moved to dismiss the indictment, asserting that another trial would subject him to double jeopardy. The circuit court denied his motion. He filed an interlocutory appeal and presents one issue, which we have reworded:

> Did the court abuse its discretion by granting the State's motion for a mistrial on the ground of manifest necessity?

We will affirm. During opening statement, appellant's trial counsel presented the jury with an extremely detailed exculpatory narrative, but failed to present any evidence whatsoever to support it. The State moved for a mistrial, asserting that its case was irreparably prejudiced. After hearing argument from counsel and reviewing the opening statement, the trial court carefully considered the possible remedies—i.e., an instruction to the jury or allowing latitude to the State in closing argument—and concluded that neither would be effective. The court then granted the State's motion on the basis that doing so was manifestly necessary. We conclude that the trial court did not abuse its discretion in doing so. Therefore, principles of double jeopardy do not bar a new trial.

## Background

On November 5, 2012, Gerald Cox became alarmed because his daughter, Deborah Simon, had not returned his recent telephone calls. Mr. Cox went to her residence on Washington Boulevard in Baltimore and found his daughter lying dead in a pool of her own blood on her kitchen floor. The police investigation established that Ms. Simon had been murdered and that the murder took place on the evening of November 3.

Appellant was charged with first-degree murder, robbery, and concealing a dangerous weapon in connection with Ms. Simon's death. Appellant was tried before a jury of the Circuit Court for Baltimore City, the Hon. Kendra Y. Ausby, presiding, in June 2015.[1] After the trial court granted the State's motion for a mistrial, appellant filed a motion to dismiss his indictment, asserting that the constitutional prohibition against double jeopardy barred a new trial. The circuit court, the Hon. Evelyn Omega Cannon, presiding, denied the motion.

## Defense Counsel's Opening Statement

The parties' contentions revolve around defense counsel's opening statement. We will set it out in full:

> Ladies and gentlemen, Antonio Johnson is innocent. Mr. Johnson did not kill Deborah Simon. Antonio Johnson had nothing to do with Ms. Simon's death. Somebody else killed Deborah Simon, and Mr. Johnson was later duped into holding the bag.
>
> Now, ladies and gentlemen, the State wants you to believe that its case is open and shut. After all, the police found Antonio Johnson with Ms. Simon's luggage. Forensic testing revealed spots of Ms. Simon's blood on Mr. [Johnson's] right shoe, pant leg, and sleeve. Therefore, the State says Mr. Johnson must have killed Ms. Simon.
>
> But, ladies and gentlemen, if you carefully examine the evidence in this case, you will see that something does not add up. The pieces of the puzzle do not fit together. The evidence you would expect to find, if Mr. Johnson had killed Ms. Simon, is not there. You'll see that Mr. Johnson only came into possession of Ms. Simon's luggage after the homicide.
>
> Ladies and gentlemen, you will see that this is a case where the

---

[1]The June 2015 trial was appellant's second trial for Ms. Simon's murder. The first trial also ended in a mistrial.

2

police rushed to judgment. If you follow the trail of forensic evidence in this case, you will see that that trail leads away from Antonio Johnson and towards somebody else. Ladies and gentlemen, Antonio Johnson had nothing to do with Deborah Simon's murder.

Now, back in November 2012, both Antonio Johnson and Ms. Simon lived on the 1200 block of Washington Boulevard. They only lived about nine houses apart. They were not close friends, but they had the polite, cordial relationship one would expect neighbors to have who live on the same block. There was no history of hostility between them.

Mr. Johnson washed cars for neighbors on the block. He made friends easily. He was somebody who never met a stranger. Now, back in November 2012, Mr. Johnson was also struggling with an addiction to drugs, and Mr. Johnson would perform odd jobs, such as selling cigarettes, to make extra money to support his habit.

Now, on November 3rd, 2012, a Saturday, Mr. Johnson got into the argument with his girlfriend about his drug use. Later in the day, he washed cars. In the late afternoon hours, afterwards, he made his way out to East Baltimore where his mom lived. He saw his mom. He asked his mom for money. His mom gave him some money. He left the house, went to the projects, bought drugs, used the drugs, got high. You'll see that he went back to his mother's house and then eventually made his way back to a bus stop and took both the Orange Line and the Green Line back to the area where he lived.

He got off of the bus around the B&O Railroad Museum on Pratt Street. Now, by this point in time, it was already dark. It was nighttime. On his way back to his house, he walked through the grounds of Baltimore Behavioral Health off of Pratt Street. Mr. Johnson saw a man with the piece of luggage. Now, Mr. Johnson didn't know this man by name, but he recognized him as somebody who he had done drug activity with in the past.

Mr. Johnson and the man greeted each other with a hug. Mr. Johnson noticed that the man had a stem in his hand, a stem used for smoking drugs. Mr. Johnson and the man, in the dark of night, then proceeded to get high again.

Now, Mr. Johnson asked the man about what was in the luggage. The man showed him the contents of the luggage, and in the luggage there was a carton of Marlboro cigarettes. And there was also some gray object, which later turned out to be a printer.

3

But what caught Mr. Johnson's attention was that carton of Marlboro cigarettes. Mr. Johnson saw this as an opportunity to make some money by selling the cigarettes so he could make some additional cash. So Mr. Johnson and the man walked around trying to sell cigarettes out of this piece of luggage.

You will see that, later on that evening, a police officer stopped Antonio Johnson on Washington Boulevard, and this police officer stopped him and arrested him for misdemeanor warrant that was out for Mr. Johnson. When the officer stopped Mr. Johnson, the officer saw him with this piece of luggage, which contained this carton of Marlboro cigarettes.

Now, you will see that when the officer approached Mr. Johnson and spoke with him, the officer did not notice anything unusual or out of the ordinary about Mr. Johnson's behavior. Antonio Johnson did not appear to be anxious to the police officer. He did not appear to be upset. There was nothing erratic about his behavior. Mr. Johnson did not try to run or flee as the officer approached him. Antonio Johnson made no effort to try to distance himself from the piece of luggage.

Antonio Johnson did not try to run or flee as the officer approached because Antonio Johnson had nothing to hide. He was only trying to sell cigarettes out of this piece of luggage. In fact, Antonio Johnson actually asked the officer at the time he was arrested if the officer could take the piece of luggage to where he lived, to where Mr. Johnson lived with his girlfriend Peggy Cash at 1246 Washington Boulevard. The officer did this and left the luggage at Mr. Johnson's house at Mr. Johnson's request.

Now, the police later determined that piece of luggage to belong to Deborah Simon, who was found deceased in her home on November 5th, 2012. The police arrested and charged Mr. Johnson, already at Central Booking, with the murder of Ms. Simon. But you will see, ladies and gentlemen, the case against him does not add up. The evidence will show that Ms. Simon was cut and stabbed a total of 29 times, in the front, in the back, on the neck. She was cut in the jugular vein and in the aorta. You will see that there was a large volume of blood at the scene. And yet, ladies and gentlemen, on Mr. Johnson's clothing, the blood detected to be Ms. Simon's is barely visible to the naked eye. If you look at the clothing, you can hardly see anything.

Now, ladies and gentlemen, Mr. Johnson did not kill Ms. Simon. He had nothing to do with her death. Mr. Johnson unwittingly made contact with somebody involved in her homicide after the murder. When Mr.

4

Johnson made physical contact with the man and the luggage in the dark of night, Mr. Johnson did not know that that man had blood on his clothing. Mr. Johnson did not know that blood was transferred from that man to Mr. Johnson's clothing. Mr. Johnson had no idea that that piece of luggage was connected in any way to a homicide. That's why he did not try to run or flee when the officer approached. He had nothing to hide.

Ladies, gentlemen, somebody else killed Deborah Simon, and Mr. Johnson was duped into holding the bag.

Now, ladies and gentlemen, you will see that other property -- a television, a laptop computer, and a cell phone -- were taken from Ms. Simon's residence at the time of the homicide. Yet you will see that none of that property -- a cell phone, a television, and a laptop computer -- were found on Mr. Johnson at the time of his arrest. None of that property was found inside of Mr. Johnson's house. None of that property was found on Mr. Johnson or in his house because somebody else killed Deborah Simon and stole that property.

You will see that, in this case, the police collected two knives into evidence that they suspected were used in the homicide. Yet you will see that there is not one iota of forensic evidence connecting Mr. Johnson to those knives. No fingerprints. No DNA.

Ladies and gentlemen, you will also see that there's not one shred of forensic evidence implicating Antonio Johnson that was found in Ms. Simon's house, the scene of the homicide. Mr. Johnson's DNA was found nowhere in Ms. Simon's house, the scene of the murder. Mr. Johnson's fingerprints were found nowhere in Ms. Simon's house, the scene of the homicide. Ladies and gentlemen, you will see that if you follow the trail of forensic evidence in this case, that trail leads you away from Antonio Johnson and toward somebody else.

You will see that Ms. Simon's house appeared to be ransacked following the homicide, particularly the living room area. Her wallet was found upside down on the floor with the money missing. The evidence will show that the DNA of an unknown male was found on the outside of that wallet. The evidence will show that the fingerprints of an unknown person were found at two critical locations inside of Ms. Simon's home.

Ladies and gentlemen, you will see that the police in this case failed to follow through on important investigative leads, which could have helped resolve what really happened. Because of the police failure to follow those important investigative leads, at the end of this case, you'll be left to guess

5

and to speculate as to what really happened. Ladies and gentlemen, this is a case where the police rushed to judgment. As a result of the police rush to judgment, Mr. Johnson sits here accused of a crime he did not commit.

I ask you to remember throughout these proceedings that the burden is on the State to prove its case beyond a reasonable doubt. This high standard of proof exists to protect the innocent from wrongful conviction. This high standard exists to protect the innocent from false accusations. Antonio Johnson has been wrongly accused.

I ask you to withhold judgment in this case until the end of the trial, until after you've heard all the evidence. I'm confident that if you do so, you will find Mr. Johnson not guilty on all counts.

## The State's Case

The evidence presented by the State was that Ms. Simon returned to her row home on Washington Boulevard just before 8 p.m. on November 3, 2012. Two days later—November 5, 2012—Ms. Simon was found, dead, lying in a pool of blood on her kitchen floor, wearing the same clothes she had worn two days earlier. Ms. Simon had been stabbed and beaten to death. There were no signs of forced entry, but the front room of her house appeared to have been ransacked.

The State also presented evidence that, just after midnight on November 4, 2012—that is, several hours after Ms. Simon returned home—appellant was stopped on Washington Boulevard by Baltimore City Police Officer Dien Pham,[2] and arrested after

---

[2]Officer Pham stopped appellant because he had responded to a service call regarding a person matching appellant's description. Appellant's girlfriend, Peggy Graves, called the police after appellant returned to the home they shared on Washington Boulevard, following an argument regarding appellant's drug use. Ms. Graves reported to the police that there was a warrant out for appellant's arrest.

Officer Pham discovered that there was a warrant for his arrest. At the time, appellant was in possession of a rolling suitcase. Officer Pham searched the suitcase and found a printer, a pack of cigarettes, and a lighter. Because the contents were not dangerous, Officer Pham inquired as to how he should dispose of the suitcase. At appellant's request, Officer Pham asked Peggy Graves,[3] appellant's girlfriend with whom he had resided on Washington Boulevard, whether she would be willing to keep the suitcase until he could retrieve it. She agreed and Officer Pham left the suitcase at her residence.

On November 6, 2012, Ms. Graves found a knife in her backyard and called the police. Ms. Graves knew that a woman down the street had been murdered, and suspected that the knife might be related. One of the officers assigned to the Simon investigation was Baltimore City Police Detective Chris Brockdorff. He responded to Ms. Graves's call and learned from her that a suitcase had been left at her residence two days earlier.

The significance of the suitcase became apparent to Detective Brockdorff a few hours later, when he spoke to Ms. Simon's parents. Ms. Simon's parents inquired as to whether Detective Brockdorff had seen a Samsonite rolling-suitcase that they had recently given to Ms. Simon, and they reported that certain electronics, including a printer, a laptop, a television, and a cell phone, were missing from Ms. Simon's home. Detective Brockdorff executed a search and seizure warrant at Ms. Graves's home, and

---

[3]In the record, Ms. Graves is sometimes referred to as "Peggy Cash."

recovered the suitcase. The suitcase contained a printer, pack of cigarettes, and lighter.

At this point, police identified appellant as a suspect, and executed a search and seizure warrant at the Central Booking and Intake Facility. The police recovered the clothes that appellant was wearing at the time they executed the warrant, a blue jersey, black sneakers, and black jeans, as well as the clothes he was wearing when he was arrested, a black hooded sweatshirt and a black hat. The police also swabbed appellant for DNA.

The police recovered a fingerprint on the pack of cigarettes, which was ultimately identified as belonging to Ms. Simon. Laboratory test results revealed that stains on appellant's sweatshirt, jeans, and right shoe tested positive for the presence of blood. Ms. Simon was determined to be the major female DNA contributor to stains on all three items.

Aside from the fact that Ms. Simon and appellant resided on Washington Boulevard in November 2012, the only evidence that they knew each other came from Ms. Graves. She testified that appellant washed cars to earn money, and that appellant had said that Ms. Simon owed him five dollars for washing her car.

### The State's Motion for Mistrial

It took the State the better part of four days to present its case-in-chief. After the State rested its case, defense counsel moved for judgment of acquittal. The court denied

8

the motion, and defense counsel proceeded to advise appellant of his right to testify. Appellant elected not to testify and the defense rested without calling any witnesses. Immediately thereafter the State moved for a mistrial.

The State argued that, in light of the defense's opening statement, appellant's decision not to testify necessitated the grant of its motion for a mistrial. According to the State, the defense presented its case through its opening statement, communicating what appellant would have testified to and his explanation for events, without providing any evidence to support the assertions. The State raised two arguments in support of its contention that the opening statement was "severely prejudicial." First, the State asserted that it would be prohibited from arguing to the jury that the defense failed to present evidence to support the narrative of events that it provided in its opening statement. Second, the State argued that, because "[n]one of the testimony that is in evidence would support that theory which the defense raised in its opening," the defense "backdoor[ed] testimony without the State having an opportunity to cross-examine him."

Defense counsel opposed the motion, arguing that "a mistrial is not warranted just because the defense did not put on evidence to establish everything that was said during opening statements." Rather, defense counsel asserted that any prejudice to the State could be remedied. In support of this contention, defense counsel observed that: (1) the State's concerns could be addressed through a jury instruction providing that opening statements and closing arguments are not evidence; (2) it would be impermissible for the

9

defense to argue facts not in evidence in closing argument; and (3) the State could point out, in closing, that the defense had made certain representations during its opening statement, and that there was not any evidence to support those representations.

After hearing argument from both parties, and reviewing the opening statement, Judge Ausby granted the State's motion for a mistrial. The relevant portion of the transcript reads as follows:

THE COURT: The Court, having [reviewed] the opening statement of defense counsel, [and] based upon the limited case law that we have looked at, I think what we rely on most is that the Court exercise its discretion in determining whether or not to grant motions for mistrial, in this particular case the Court is faced with two -- what I can only see as two options.

Let me first make a finding that the defense's opening statement . . . was a very detailed and quite convoluted story about the activities of the Defendant on the night of the homicide. It involved several other people, not just the Defendant or the mystery perhaps assailant, or at least the mystery man with the blood, it involved the Defendant's mother, the Defendant's mother's house, another part of town, the bus number that he took, the name of the -- what is it, the Baltimore Behavioral Health. It was quite detailed.

And so the Court is left . . . to make a decision as to what to do with the fact that the defense has placed that information into the minds of the jury and has elected, as they're allowed, to not present any evidence in this case. And this Court finds that there's two ways to do it -- well, three, I guess. The first way would be for the Court to essentially allow the State to argue however it wishes to argue in closing argument about that which the defense counsel presented in the opening statement and how the evidence that the Defendant -- how the evidence was not presented, put it that way. Even if we take it the way the defense counsel has said, they can argue all of what he said, every piece of detail, and how the evidence, quote-unquote, "didn't show that."

10

With that level of detail, even if I limited the State to saying the defense counsel stated the following and they recite everything verbatim, which they would be allowed to do, that defense counsel said, there's absolutely no way with that level of detail that the statement "the evidence doesn't show any of all of that" is not a burden-shifting statement, there's absolutely no way. And the Defendant is not required to waive any rights -- I don't even know if that's a waiveable right -- under that.

And then the second option obviously would be to have the Court to instruct the jury, in addition to the regular jury instruction that opening statements are not -- opening statements and closing arguments are not evidence, to then specifically instruct the jury to ignore, I guess, the information presented in the story told by the defense and the version of the facts, quite frankly, told by the defense in opening statement.

And then, obviously, the third option is to grant the State's motion for a mistrial.

As to the first option, the Court finds that the right, if you will, against burden-shifting language and the Defendant's right to -- the State's burden to prove the case beyond a reasonable doubt and that burden being ensured by the Defendant, the Defendant's right to not present any evidence and not even have to refute or rebut the State's evidence, and not have the fact that he chose not to present any evidence, whether it was his testimony or any other testimony, be held against him is -- I think it's irrevocable, I don't even think he could waive it, even though we tossed that around earlier, at least I did. And I think of all of the things that we have discussed today and all of the options it is the highest of rights and it is the one that should be least tampered with even in a situation like this.

So the Court finds that that would be the least appropriate option and mostly because I don't -- like I said, even if I limited the State to say, defense counsel said this and the evidence didn't show this, because the defense counsel said so much, I don't know how that doesn't translate into he said it and didn't prove it. And that -- so I think that's the

11

right that should least be tampered with.

The next [option] then would be the instruction. [I]n a different case, I think that perhaps the instruction would be appropriate and the additional instruction would be appropriate, but in this particular case, as we have just heard, there is an entire fact pattern that was given to the jury. It's not just -- it's not even -- I don't even know, you know, that he got the bag from someone else, it's not even that someone else killed her -- and some of the statements were -- some of the evidence I guess came out through the State's case and I assume defense counsel knew that would come out through the State's case, but there's an entire convoluted fact pattern and I -- the Court is not satisfied that a special instruction can cure all of that. I just think, in this particular case, it's just entirely, entirely too much. It's not a statement that it happened a different way in general or that someone else did it or they got the wrong person, it is an entire convoluted fact pattern for which the Court believes that it could not be -- I don't think it could be cured by just giving the jury instruction and/or reminding them that the statement itself is not evidence.

And so with that being said, I guess the third option is what it was, is that the Court exercise its discretion in granting a mistrial in this case. The motion is granted.

\* \* \* \*

DEFENSE COUNSEL:   Your Honor, the defense objects, most respectfully.

\* \* \* \*

PROSECUTOR:   [J]ust to clarify for the record, is the Court finding that there is manifest necessity given the circumstances of this case?

THE COURT:   Yes.


\* \* \* \*


DEFENSE COUNSEL:   And again, Your Honor, the defense objects.

12

* * * *

THE COURT: Yes. I'm sorry, the record should reflect that the -- as I went through the three options, the manifest necessity comes out of the fact that what -- what I said, why that was the only option left -- . . . . -- which equals manifest necessity.

## The Appellant's Motion to Dismiss

After the State's motion for mistrial was granted, appellant filed a motion to dismiss the indictment against him. Appellant asserted that the trial court abused its discretion in finding that "manifest necessity" required declaration of a mistrial, and thus, pursuant to the prohibitions against double jeopardy contained in the Fifth Amendment to the United States Constitution and the common law of Maryland, he could not be retried. Appellant argued that alternatives to a mistrial were available, specifically, that the trial court could have instructed the jury that opening statements are not evidence and that the jury should disregard the unsupported portions of defense counsel's narrative, and/or permitted the State to comment on the unsubstantiated representations made in the opening statement in its closing. Appellant also argued that the court erred in concluding that it was impermissible for the State to comment on the unsubstantiated representations. Further, appellant noted that the contested portions of the opening statement were not "inadmissible, improper, or prejudicial at the time the [statement] was delivered to the jury," and that defense counsel made his opening "in good faith with the reasonable expectation that [appellant] would testify."

13

After hearing argument on appellant's motion to dismiss and the State's opposition thereto, Judge Cannon denied the motion.

**Analysis**

Where "a mistrial is granted over the objection of a [criminal] defendant," the principles of double jeopardy, reflected in both the Fifth Amendment to the United States Constitution and the common law of Maryland, bar retrial, unless "there exists 'manifest necessity' for the mistrial." *Simmons v. State*, 436 Md. 202, 213–14 (2013). Whether manifest necessity exists is a fact-intensive determination, "depend[ing] on the unique facts and circumstances of the case." *Id*. at 214. Whether to grant a mistrial is a matter of the trial court's discretion. *Id*. at 212. Appellate review is deferential because "the trial judge is far more conversant with the factors relevant to the determination than any reviewing court can possibly be." *Id*. (internal quotation marks and citations omitted). Accordingly, as the Court explained in *Simmons*, "we look to whether the trial judge's exercise of discretion was 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id*. (quoting *Stubbs v. State*, 423 Md. 454, 465 (2011)).

The burden is on the State to demonstrate that a "high degree of necessity" exists to justify declaration of a mistrial. *Hubbard v. State*, 395 Md. 73, 92 (2006) (internal citation and quotation marks omitted). The Court of Appeals, and the Supreme Court, have found that a high degree of necessity exists where there is "no reasonable alternative to the declaration of a mistrial." *Id*. at 91–92. "'[T]o determine whether manifest

14

necessity to declare a mistrial . . . exists, the trial judge must engage in the process of exploring reasonable alternatives and determine that there is no reasonable alternative to the mistrial.'" *Simmons*, 436 Md. at 215 (quoting *Hubbard*, 395 Md. at 92).

Appellant, as he did at trial and before the motions court, asserts that the trial court had two reasonable alternatives to declaring a mistrial: (1) providing the jury with a corrective instruction; and (2) permitting the State to comment, in closing argument, on defense counsel's failure to introduce evidence to support the narrative he presented in his opening statement.[4] We will discuss these contentions separately.

— A Corrective Instruction —

In elaborating on his first contention, appellant argues that the trial court could have cured any prejudice by instructing the jury that opening statements are not evidence and that the jury "should disregard defense counsel's opening statement in its entirety." Appellant argues that "in light of the strength of the State's case against [appellant], it was extremely unlikely that the instruction would not cure any prejudice that may have flowed from defense counsel's opening statement" because "[j]urors are presumed to follow a court's instructions, and there was no suggestion that this jury would not be able to do so[.]" In response, the State argues that a corrective instruction would not have cured the unfair prejudice of defense counsel's opening statement.

---

[4]Appellant asserts that these remedies are non-exclusive. The trial court did not agree, nor do we. Instructing a jury to completely disregard defense counsel's opening statement—while simultaneously permitting the prosecutor to discuss the same opening statement in detail—is a recipe for juror confusion.

First, appellant's appellate contentions notwithstanding, the trial court could not have instructed the jury to "disregard defense counsel's opening statement in its entirety." This is because there were parts of the opening statement that were unrelated to defense counsel's unsupported exculpatory factual narrative. For example, counsel stated that the evidence would show that Ms. Simon's cell phone, laptop computer, and television were missing from her home, but were not found in appellant's possession. This is completely proper opening statement and the trial court would have erred had it instructed the jury to disregard it.[5]

Another problem with a corrective instruction is that such instructions "must be *timely*, accurate, and effective." *Simmons*, 436 Md. at 219 (citation omitted; emphasis added). Any corrective instruction in this case would not have been timely because four days of trial had elapsed between defense counsel's opening statement and his client's decision not to testify. *See Simpson v. State*, 442 Md. 446, 463 (2015) (A trial court's corrective instruction given to the jury three days after an improper opening statement does not "'cure' the error created by the State's opening.").

Moreover, it is clear that the trial court considered carefully whether a corrective instruction would be effective. The court acknowledged that, "in a different case, I think that perhaps the instruction would be appropriate[.]" The court continued (emphasis

---

[5]The same is true of defense counsel's statement that "you will see that there is not one iota of forensic evidence connecting Mr. Johnson to those knives [suspected by the police to be the murder weapons]. No fingerprints. No DNA."

added):

> but in this particular case, as we have just heard, there is an entire fact pattern that was given to the jury . . . . [T]here's an entire convoluted fact pattern and I -- the Court is not satisfied that a special instruction can cure all of that. I just think, in this particular case, it's just entirely, entirely too much. It's not a statement that it happened a different way in general or that someone else did it or they got the wrong person, *it is an entire convoluted fact pattern* for which the Court believes that it could not be -- I *don't think it could be cured by just giving the jury instruction and/or reminding them that the statement itself is not evidence*.

*Simmons* provides a useful, although not an exact, analogy. In *Simmons*, defense counsel, in his opening statement, informed the jury that his client had offered to take a lie detector test while being questioned by police. 436 Md. at 207. The prosecutor objected and the trial court gave a corrective instruction to the jury. The prosecutor did not move for a mistrial until the next day. In deciding that a mistrial was necessary, the trial court stated that defense counsel's opening statement "in effect, constituted a substitute for the defendant's testimony[,]" and that "there's no way to erase the potential infection of the jurors' minds [that he offered] to take a lie detector test." *Id.* at 222 (internal quotation marks omitted). The Court of Appeals agreed with the trial court's conclusions:

> [I]n making his finding of manifest necessity, the trial judge noted that "an opening statement is a powerful setting," and that "in this particular instance, we're dealing with a statement not . . . unexpectedly presented by a witness, but a statement carefully made as part of a preview of the evidence to the jury." The trial judge further stated, "the statement, in effect, constituted a substitute for the defendant's testimony . . . [and] credibility is central to the prosecution of this case." Therefore, according to the judge, "there is no way to erase the potential infection of the jurors'

17

minds as to [Petitioner's] offer[ ] to take a lie detector test."

Moreover, in considering the motion for mistrial, the trial judge essentially reviewed the efficacy of his own prior curative instruction. Although . . . it is generally presumed that the jury can and will follow them . . . . the trial judge is in the best position to determine whether his instructions achieved the desired curative effect on the jury. In the present case, when the State requested a mistrial, the trial judge considered whether the prejudice caused by the improper statement transcended the curative effect of the instruction. . . . In concluding that "there is no way to erase the potential infection of the jurors' minds," the trial judge determined that the curative instruction was not enough to overcome the prejudice caused by the reference to Simmons's offer to take a lie detector test. Based on these findings by the trial court, we conclude that the trial judge did not abuse his discretion in determining that manifest necessity existed to warrant a mistrial and that the curative instruction was insufficient to cure the prejudice caused by the reference to Petitioner's willingness to take a lie detector test.

*Id*. at 221–23 (citations and some quotation marks omitted).

Returning to the case before us, defense counsel's opening statement set out a coherent and detailed narrative, in the trial court's words, an "entire convoluted fact pattern," that certainly constituted a substitute for appellant's testimony. When appellant declined to testify, the State was effectively, if not intentionally, sandbagged. As the *Simmons* Court noted, "'the practical and human limitations of the jury system cannot be ignored.'" 436 Md. at 219 (quoting *Bruton v. United States,* 391 U.S. 123, 135 (1968)). The trial court did not abuse its discretion in concluding that a corrective instruction would not adequately cure the prejudice caused to the State by counsel's opening statement.

18

— Latitude In Closing Argument —

Appellant also asserts that the trial court erred when it concluded that the State could not effectively address any prejudice even if it were permitted to comment upon defense counsel's opening statement in its own closing argument. According to appellant, "the court rejected that alternative because it believed that such a closing argument would amount to impermissible burden-shifting or to an impermissible comment on [appellant's] constitutionally protected right not to testify." Citing to *Wise v. State*, 132 Md. App. 127, 148 (2000), appellant contends that the opening statement "'open[ed] the door to . . . fair comment'" about "the lack of evidence produced," regardless of whether it would draw attention to appellant's decision not to testify. Appellant thus contends that, because the court failed to properly consider this alternative, the trial court's conclusion that there was a manifest necessity for a mistrial must be reversed.

In response, the State asserts that "the trial court did not misapprehend its authority to afford leeway in closing," rather, in light of the extensive narrative defense counsel provided, the trial court determined that addressing it would result in impermissible burden shifting. We agree with the State.

We will first set out the legal background.

Prosecutors are entitled to comment in closing argument on matters raised by defense counsel, under the "opened door" doctrine. *See Mitchell v. State*, 408 Md. 368,

387–88 (2009). The opened door doctrine can apply to matters raised by defense counsel in opening statement. *Id.* at 388 (citing *Terry v. State*, 332 Md. 329, 337 (1993)). The opened door doctrine is limited, however, by the constitutionally-based prohibition against "burden shifting," which derives from the landmark Supreme Court decision in *Griffin v. California*, 380 U.S. 609, 614 (1965). In *Griffin*, the Court held that a prosecutor may not comment upon a defendant's failure to testify because to do so would violate the defendant's Fifth Amendment rights. There are two instructive Maryland cases that address this tension: *Mitchell v. State*, 408 Md. 368 (2009), and *Wise v. State*, 132 Md. App. 127 (2000).

As we explained in *Wise*, while a prosecutor may address assertions made by defense counsel in closing argument, "[s]uch comments are impermissible whether they be intended to call attention to the defendant's failure to testify or be of such character that the jury would naturally conclude that it was a comment about the failure to testify. *Calling attention to the fact that a defendant failed to present evidence sails dangerously close to the wind*." 132 Md. App. at 142–43 (citations omitted; emphasis added). In *Wise,* we recognized that decisions since *Griffin* "have distinguished between those comments about a defendant's failure to explain by testifying and those comments about the failure of the defendant to explain through other witnesses." *Id*. at 143.

In *Wise*, defense counsel, in opening statement, made a number of assertions about what the evidence would show, and then failed to introduce support for certain

20

assertions. *Id*. at 143–45. In closing, the prosecutor "dr[ew] the jury's attention to the fact that defense counsel had failed to fulfill his prediction in opening statement as to what he would develop at trial." *Id*. at 145. On appeal, Wise argued that the prosecutor's closing argument "improperly shifted the burden of proof to Wise by asking the jurors to consider Wise's failure to call witnesses in his defense or to testify in his own defense." *Id*. at 139. This Court then addressed whether the prosecutor's comments's constituted impermissible burden shifting. We explained that:

> Maryland prosecutors, in closing argument, may not *routinely* draw the jury's attention to the failure of the defendant to call witnesses, because the argument shifts the burden of proof. On the other hand, *a defense attorney's promising in opening statement that the defendant will produce evidence* and thereafter failing to do so does open the door to the fair comment upon that failure, even to the extent of incidentally drawing attention to the defendant's exercising a constitutional right not to testify.

*Id.* at 148 (emphasis added). We concluded that "the prosecutor's comments were a reasoned and justified response to the excesses of the defendant's opening statement and as such did not violate the defendant's constitutional rights." *Id.*

In *Mitchell*, during closing argument, defense counsel called the jury's attention to the fact that the State had not called six individuals who were present at the scene of the crime, Henderson, Corprew, Cochran, Carter, Chase, and Maurice Turner, as witnesses, even though the State had listed them as potential witnesses in its voir dire. 408 Md. at 375. Expanding on this theme to the jury, defense counsel stated: "Let's bring Wal[i] Henderson here so we can see if he's a heavyset, dark-skinned man. Let's bring Antonio

21

Corprew here so we can gauge his stature. Let's look at Man–Man [Cochran], what does

he look like?" *Id*. at 377. In rebuttal, and over objection, the prosecutor stated:

> If [defense counsel] thought that [their] being here would have shown that something we presented was so contradictory to something about them, he could have brought them in as well. *The defense has subpoena power just like the State does*. You can't say why didn't the State present a witness, when they had an equal opportunity to present it to you, and then try to say, well, it wasn't presented. *They had an equal right to present it if they thought it would contradict something we presented*.

*Id.* at 379 (emphasis added).

On appeal, Mitchell argued that the prosecutor's response was improper and

constituted impermissible burden-shifting. The Court of Appeals disagreed as to both

contentions. As to the first, the Court explained:

> [D]efense counsel, in closing argument, permissibly drew the jury's attention to the absences of Wali Henderson, Antonio Corprew, Lewis "Man–Man" Cochran, and others. By saying "Let's bring Wal[i] Henderson," Corprew, and "Man–Man" into the courthouse, however, defense counsel argued the relevancy of their absences and the weakness in the State's case. This maneuver "opened the door" for the prosecutor to offer an explanation as to why those witnesses were not present. Moreover, defense counsel's choice of language in stating "Let's bring Wal[i] Henderson," Corprew, and "Man–Man" into the courthouse for inspection associated the jurors with the defense, as if the jurors were entitled to see these witnesses and somehow were prevented from doing so by the State. In light of such language, a response by the prosecutor calling attention to Mitchell's subpoena power was fair comment.

> Accordingly, our holding in regard to the State's rebuttal argument is a narrow one. *The prosecutor's remarks calling attention to the defendant's subpoena power were a tailored response to defense counsel's assertion that all the potential witnesses should have been brought into the courtroom* given what defense counsel identified as a weakness in the State's case.

*Id.* at 388–89 (citation omitted). The Court then addressed Mitchell's argument that the prosecutor's comments constituted burden shifting:

> In holding that the prosecutor's remarks calling attention to Mitchell's subpoena power were a narrow and isolated, justified response to defense counsel's "opening the door," we conclude that such remarks did not shift the burden of proof.

*Id.* at 392. With this as background, we return to the case before us.

Appellant's suggestion that the trial court failed to properly apply the holding of *Wise* is misplaced. The holding of *Wise* is limited to cases in which defense counsel "promis[es] in opening statement that the defendant will produce evidence." 132 Md. App. at 148. In the present case, in contrast, defense counsel did not explicitly represent to the jury that his client would present evidence. Instead, counsel presented an artfully-worded narrative, which if believed, would exculpate his client. Moreover, as *Mitchell*, 408 Md. at 392, indicates, the prosecutor's comments would have to be "narrow and isolated" to avoid being "of such character that the jury would naturally conclude that it was a comment about the failure to testify." *Wise*, 132 Md. App. at 142. In the present case, any hypothetical closing argument would have been neither narrow nor isolated. As the State points out in its brief, the prosecutor would have been required to address no

23

less than 26 separate factual assertions made by defense counsel in his opening statement.[6]

<hr />

[6]They are:

(1) "Mr. Johnson only came into possession of Ms. Simon's luggage after the homicide";

(2) the forensic trail led "away from Antonio Johnson and towards somebody else";

(3) Johnson and the victim "had the polite, cordial relationship one would expect neighbors to have who live on the same block";

(4) "[t]here was no history of hostility between" Johnson and the victim;

(5) Johnson "made friends easily";

(6) Johnson "would perform odd jobs, such as selling cigarettes, to make extra money to support his [drug] habit";

(7) in the later afternoon hours of November 3, 2012, Johnson "made his way out to East Baltimore where his mom lived";

(8) Johnson saw his mother who acceded to his request for money;

(9) Johnson then "left [his mother's] house, went to the projects, bought drugs, used the drugs, got high";

(10) Johnson then "went back to his mother's house and then eventually made his way back to a bus stop and took both the Orange Line and the Green Line back to the area where he lived";

(11) Johnson "got off of the bus around the B&O Railroad Museum on Pratt Street," by which time it was already dark;

(12) on Johnson's "way back to his house, he walked through the grounds of Baltimore Behavioral Health off of Pratt Street";

(13) Johnson "saw a man with the piece of luggage";

(14) Johnson "didn't know this man by name, but he recognized him as somebody who he had done drug activity with in the past";

(15) Johnson "and the man greeted each other with a hug";

(16) Johnson "noticed that the man had a stem in his hand, a stem used for smoking drugs";

(continued...)

24

In explaining why it was granting the State's motion for a mistrial, the trial court stated that:

> With that level of detail, even if I limited the State to saying the defense counsel stated the following and they recite everything verbatim, which they would be allowed to do, that defense counsel said, there's absolutely no way with that level of detail that the statement "the evidence doesn't show any of all of that" is not a burden-shifting statement, there's absolutely no way.

It is apparent that the trial court understood that the State is permitted, in its closing argument, to address unsubstantiated remarks by the defense in opening statement. It is equally clear that the court concluded that permitting the State to do so in

---

(...continued)

(17) Johnson "and the man, in the dark of night, then proceeded to get high again";

(18) Johnson "asked the man about what was in the luggage";

(19) the "man showed him the contents of the luggage, and in the luggage there was a carton of Marlboro cigarettes";

(20) "there was also some gray object, which later turned out to be a printer";

(21) the cigarettes caught Johnson's attention as "as an opportunity to make some money by selling the cigarettes so he could make some additional cash";

(22) Johnson "and the man walked around trying to sell cigarettes out of this piece of luggage";

(23) "[w]hen [Johnson] made physical contact with the man and the luggage in the dark of night, [Johnson] did not know that that man had blood on his clothing";

(24) Johnson "did not know that blood was transferred from that man to Mr. Johnson's clothing";

(25) Johnson "had no idea that that piece of luggage was connected in any way to a homicide"; and

(26) "somebody else killed Deborah Simon, and Mr. Johnson was duped into holding the bag."

the present case would not have been helpful to the jury in light of the level of detail provided in defense counsel's narrative. Moreover, the court recognized, appropriately in our view, that a point-by-point rebuttal to defense counsel's narrative would have the adverse, and impermissible, effect of creating confusion among jury members as to which party bore the burden of proof. The trial court did not abuse its discretion in declining to require the prosecutor to make such an attempt.

In *Simmons*, the Court of Appeals observed that "[a] trial court's ruling [in] the particular situation leading to [a] mistrial . . . 'falls in an area where the trial judge's determination is entitled to special respect.'" 436 Md. at 217 (quoting *Arizona v. Washington*, 434 U.S. 497, 510 (1978)). The *Simmons* Court also noted that in such situations, "the trial judge's evaluation of the likelihood of prejudice was given 'the highest degree of respect.'" *Id*. at 218 (quoting *Washington*, 434 U.S. at 511).

We conclude that Judge Ausby did not abuse her discretion in deciding that there was a manifest necessity for granting the State's request for a mistrial. Therefore, we affirm Judge Cannon's order denying appellant's motion to dismiss the indictment.[7]

**THE ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. APPELLANT TO PAY COSTS.**

---

[7]This opinion was originally filed as unreported. The Office of the Attorney General filed a motion pursuant to Md. Rule 8-605.1(b), asserting that it was in the public interest for the opinion to be published. We will grant the motion. We withdraw the original unreported opinion and file this opinion in its stead.