UNITED STATES of America, Appellee,

v.

Gale S. MOLOVINSKY, Appellant.

Nos. 80–5189(L), 81–5068.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1982.

Decided Sept. 15, 1982.

Rehearing and Rehearing Denied Nov. 29, 1982.

---

* The terms of this agreement are set forth in *TVA v. Welch*, 150 F.2d 613, 615 (4th Cir. 1945), *rev'd.*, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946).

Benjamin Lipsitz, Baltimore, Md., for appellant.

David Dart Queen, Sp. Asst. U. S. Atty., Baltimore, Md. (J. Frederick Motz, U. S. Atty., Baltimore, Md., on brief) for appellee.

Before BRYAN, Senior Circuit Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

Gale S. Molovinsky appeals from a conviction of conspiracy to counterfeit. 18 U.S.C. § 371[1] and § 471.[2] Molovinsky was a lawyer practicing in the District of Columbia whose capacity and apparent compulsion to spend greatly exceeded his earnings (approximately $20,000 per annum). He and Edward Sparrow both were practicing magicians and shared the condition of financial difficulty generating a need for ready cash. Sparrow, having worked in the printing supply business, had a capability to operate a printing press.

The defense has taken an interesting tack. Counsel freely conceded at oral argument that there was adequate proof of conspiracy,[3] but insisted vigorously that it was not a conspiracy to counterfeit but, at most, a conspiracy to learn how to counterfeit, or to explore and evaluate the possibility of counterfeiting. In essence, Molovinsky's counsel has pictured him as a man bent on breaking the law, but one who failed to do so, however hard he may have tried.

---

1. The statute makes it unlawful for two or more persons to conspire to commit any offense against the United States or to defraud the United States, provided that any one or more of such persons must have done an act to effect the object of the conspiracy.

2. The statute outlaws forging, counterfeiting, or uttering any obligation or other security of the United States.

3. In his testimony, Molovinsky stated concerning his relationship with Sparrow: "Certainly we were conspirators."

The question thus becomes whether, in doing the following things in concert with Sparrow, Molovinsky nevertheless eluded the snares of 18 U.S.C. §§ 371 and 471:

1) On April 7, 1980 a stockbroker acquaintance of Molovinsky, Arthur Bacon, called the United States Secret Service to report that in mid-March 1980 Molovinsky had called to ask a "hypothetical" question as to an effective method for disposing of a large quantity of counterfeit money. Having posed the question, Molovinsky suggested that Bacon "ask around." When Bacon later received another call from Molovinsky to inquire what he had learned, Bacon concluded that Molovinsky had not purely a hypothetical but, indeed, a personal interest and that Molovinsky was serious. That led to Bacon's initial call to the Secret Service.

2) Bacon, complying with a request from the Secret Service, telephoned Molovinsky to say that he had information about someone who might be able to dispose of large .quantities of counterfeit currency. Molovinsky thereupon confirmed Bacon's role as the introducer of a buyer and agreed to a finder's fee of $10,000. Without revealing any identity of another, Molovinsky indicated that he was not alone in the project.

The Secret Service provided an undercover agent, Steven Israel, who assumed the pseudonym of Steven Gerstein.

3) A meeting then took place on May 5, 1980 between Molovinsky, Sparrow, Bacon, and Gerstein. Observer Secret Service agents were also present in the restaurant where the meeting took place. Gerstein expressed a capacity and willingness to purchase counterfeit currency from Sparrow and Molovinsky. Sparrow, with Molovinsky's concurrence, indicated that only a single large scale production run of $20 bills should be made. Sparrow further spoke in terms of producing counterfeit currency with an aggregate face value of $5,000,000.

4) During the May 5, 1980 meeting, Molovinsky reported Sparrow's and his contact with several printers leading to identifica-

tion of a man in Baltimore with weekend access to a substantial printing facility. Molovinsky and Sparrow stated that the Baltimore man wanted $25,000, but was being cautious.

5) Also at the May 5, 1980 meeting, Sparrow reported efforts to obtain large quantities of high quality paper and produced two metal plates appearing to contain on their faces likenesses of the $20 Federal Reserve Note.[4] The plates were, in fact, magic props, but they looked very much like currency plates. The purpose of Sparrow's production of the plates was to overstate the degree to which Sparrow and Molovinsky had progressed in order to keep Gerstein interested.

6) In the course of the May 5, 1980 meeting, Molovinsky provided a business card which he gave to Gerstein, after Sparrow had added his own name and telephone number, in order to permit Gerstein to "get in touch."

7) In subsequent telephone conversations with Gerstein, Molovinsky: (a) stated that "we" went all around contacting printers; (b) exhibited a detailed knowledge of printing and counterfeiting; and (c) spoke of cutting Sparrow out of the deal, thus acknowledging that, up until that point in time, there was concerted action, a conspiracy, between Molovinsky and Sparrow.

8) With commendable diligence, the Secret Service ran down John Haig, a printer located in Forestville, Maryland, whom Molovinsky and Sparrow had approached in April of 1980. They had inquired about the possibility of printing pornography and "illegal green cards, birth certificates and drivers licenses." In front of Haig, Molovinsky and Sparrow spoke about running the printing equipment themselves. The offer was made by Molovinsky and Sparrow of $25,000 for the use of Haig's printing shop for a month. When Haig, on a third visit from Molovinsky and Sparrow, declined their offer, he gave them the name

---

4. Molovinsky subsequently produced the metal plates himself in a meeting with Gerstein on

May 9, 1980.

of another printer who possibly might be interested.

9) Following arrest of Molovinsky and Sparrow, Sparrow signed a sworn statement implicating both himself and Molovinsky in the scheme in return for a non-prosecution agreement calling for Sparrow's cooperation. In the event, however, the government did not call Sparrow to testify.

## I.

■ Following the foregoing outline of the facts, the contention that there was no conspiracy to counterfeit but rather only one "to learn how to counterfeit" need not detain us long. 18 U.S.C. § 371 makes it a felony to conspire to commit any offense against the United States if one or more of the conspirators does "any act to effect the object of the conspiracy." A criminal object, specifically that unlawful utilization of facilities was intended, may be inferred from facts and circumstances proved at trial to the effect that the transactions did not conform in character to customary sales of free commodities. *Direct Sales Co. v. United States*, 319 U.S. 703, 711–13, 714–15, 63 S.Ct. 1265, 1269–71, 87 L.Ed. 1674 (1943). The cooperation between Molovinsky and Sparrow in their joint endeavor supports the inference of an agreement to seek to achieve the criminal object of counterfeiting.

■ Molovinsky seeks to hang his case on the proposition that he did not have the plates, that the magic props were not counterfeiting plates at all since they were totally ineffectual for such a purpose, and that, consequently, he could not have conspired to counterfeit. However, counterfeiting, as is the case with many other crimes, has a number of components. Final production of the false currency is not the only one. Approaching proprietors to line up printing facilities, a step towards production, was an overt act. Distribution is also significant, and Molovinsky and Sparrow, in their efforts to open a distribution line through Bacon and Gerstein, did an act to effect the object of the conspiracy; they did an act to effect counterfeiting.

Presumably, had Molovinsky acted alone, without the collaboration of Sparrow, a conspiracy between himself and a Secret Service agent could not have been deemed to have occurred because the agent would not qualify as the second person conspiring to commit an offense against the United States. *United States v. Thompson*, 598 F.2d 879, 880 (4th Cir. 1979). The same would appear to be true of Bacon's role, his collaboration having been only apparent, not real.

However, we are here concerned not with whether two or more persons conspired. It is conceded that Molovinsky conspired with Sparrow. The question is whether the conspiracy had as its object the offense of counterfeiting and whether either Molovinsky or Sparrow did any act to effect the object of the conspiracy. That counterfeiting itself, rather than merely a preliminary fact-finding escapade was the object is self-evident. No other credible explanation can be advanced for the contacts with Bacon, Gerstein, and Haig. The talks with Haig to establish access to a production facility[5] and the conversations with Gerstein and Bacon concerning a distribution avenue amounted to acts designed to effect the criminal object of the conspiracy, counterfeiting.[6]

Indeed, had Molovinsky and Sparrow not yet obtained any plates of any kind the conspiracy would nevertheless have ripened

---

5. The talks with Haig were not alleged in the indictment because the government did not locate him until shortly before trial. The government is not limited in its proof at trial to those overt acts alleged in the indictment. *United States v. Adamo*, 534 F.2d 31, 38 (3d Cir. 1976), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976).

6. Gerstein's status as a secret service agent and Bacon's status as a government informant did not preclude an act committed with or towards either of them from being overt. *See United States v. Kriz*, 586 F.2d 1178, 1181, n.5 (8th Cir. 1978), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

and overt acts would have occurred.[7] If conviction was appropriate in the absence of any plates, it is not rendered impossible simply because the plates were defective. "Conspiracy, of course, is an agreement plus an overt act, and the possibility of success has never been thought to be of its essence." *United States v. Rosner*, 485 F.2d 1213, 1229 (2d Cir. 1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Kellerman*, 431 F.2d 319, 323 (2d Cir. 1970), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970) ("The point made that the machine failed to operate and that, therefore, the conspiracy was frustrated and aborted is not legally sound. A conspiracy does not require successful completion of the objects thereof.").

## II.

■ Turning to a somewhat less exotic argument, Molovinsky objects to the exclusion by the district judge of testimony about improbable and farfetched, if legal, money-making schemes engaged in previously by him.[8] The purpose of the defense was to demonstrate that Molovinsky often took unrealistic fantasy trips, with the interest in the possibility of counterfeiting just another pipe dream.

The important consideration is that no efforts to break or objectives of breaking the law were involved in those schemes. To have allowed a meandering journey down such collateral paths would have distracted the jury from relevant evidence of the counterfeiting scheme itself, which was illegal. The district judge acted well within his discretion and did not abuse it in preventing the introduction of such collateral testimony. *See United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) ("The

trial judge has wide discretion as to relevance and materiality of evidence. Such rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion.... Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").

## III.

■ Sparrow in the end was not called by the government. He was, however, in the courthouse throughout the trial and could have been called by either party. The government explains that it was satisfied as to the sufficiency of the evidence without Sparrow and, therefore, elected not to call him. Certainly the government was tactically entitled to approach the case in that fashion, and the result justified the tactical decision. The remark made in closing argument to the jury on which Molovinsky bases his claim of entitlement to a new trial reads as follows:

> Now where was Ed Sparrow? I have a sneaking suspicion that Gale Molovinsky knows his address and phone number. The law provides him subpoena power. Do you think it is possible that Mr. Molovinsky might not have wanted you to hear Mr. Sparrow's version of what went on? Ladies and gentlemen, he [Sparrow] was at least as available to the defense as he was to the Government.

However, that was not an attack launched by the government. Rather it was a justified defensive response to a comment by Sparrow's own counsel to the jury:[9]

> [I]t is clear from the evidence that Sparrow was as heavily involved, subsequently, in trying to find a way of coun-

---

**7.** *See United States v. Guy*, 456 F.2d 1157, 1166 (8th Cir. 1972), *cert. denied*, 409 U.S. 896, 93 S.Ct. 136, 34 L.Ed.2d 153 (1972) ("With regard to the conspiracy count, the only crime with which Guy was charged, it was of course not necessary to prove that any particular bill was, or was not, counterfeit, or that any counterfeit notes were passed or even existed. The conspiracy alleged was one to pass counterfeit notes, and the offense was complete once the agreement was entered into and some act taken

in furtherance of it even if the conspirators fell short of ever acquiring such notes to pass.").

**8.** They were a grandiose prepaid legal services plan, unrealistic financial transactions, dabbling in inventions and buying a lot of Maryland lottery tickets.

**9.** Different counsel represented Molovinsky on appeal.

terfeiting as the defendant was. He is not here; he did not testify. He is not on trial. He is not charged. He did not testify. You cannot speculate on what his testimony might have been, but you can note his absence and ask yourself whether or not, given all the factors in this case—whether or not the Government has really proven to your satisfaction, beyond a reasonable doubt, given that they do not call the co-conspirator in, that there was an agreement to counterfeit....

We perceive no error in the decision of the district judge that the response of the government was appropriate in light of the statement made by Molovinsky's counsel.

## IV.

█ Finally, there is a contention of post-trial prosecutorial misconduct in the form of destruction of evidence which, not available to Molovinsky at the time of the trial, could have become important newly discovered evidence. It was contended that one conversation between Molovinsky and Gerstein supposedly occurring on May 5, 1980 had been tape recorded, but the government destroyed the recording. Supposedly Gerstein came to the restaurant meeting wired for sound. His testimony, however, was that he carried no concealed tape recorder at the time of the restaurant meeting,[10] explaining that customarily law enforcement practice was not to bring recorders to first meetings with potential criminals. There is a basis for concern that a wary potential criminal might insist on searching the agent.

The government thus established an evidentiary basis for a conclusion that there had existed no recording which could be destroyed. Moreover, and most significantly, it was established that counsel who represented Molovinsky at the trial knew of the claim that there was a recording of the conversation before the trial took place. Knowing of the claim, trial counsel elected not to pursue it. The supposed recording

could not, therefore, constitute newly discovered evidence. Belatedly pursued is not newly discovered. The district judge consequently acted fully in accord with *United States v. Johnson*, 596 F.2d 147, 148 (5th Cir. 1979), and *United States v. Ellison*, 557 F.2d 128, 133 (7th Cir. 1977), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977), in denying a request for an evidentiary hearing and also in denying the new trial motion.

AFFIRMED.

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

The singular infirmity in this case is the utter disregard by the Government of its duty not to subject the appellant to criminal prosecution when it could have readily known of his innocence. Typifying this attitude is the course the Government admittedly pursued under the first count of the indictment. The second count is likewise groundless for the same reason: the Government's evidence on its face failing *ab initio* to prove a crime.

The prosecution sought and obtained an indictment against the appellant in two counts. The first charged him with "knowingly and wilfully [having] in his control, custody and possession a metal plate" or plates depicting a Federal Reserve Note and charging that the appellant "did intend said plates to be used and did intend to suffer them to be used to forge and counterfeit an obligation of the United States." The second count charged Molovinsky and one Edward L. Sparrow with conspiring to forge $20.00 Federal Reserve Notes in violation of 18 U.S.C. § 471 (1976).

## I

The statute underlying the first count, *see id.* § 374 reads in relevant part as follows:

Whoever, having control, custody, or possession of any plate, stone, or other thing, or any part thereof, *from which*

---

**10.** Molovinsky, at page 8 of his Brief in the Statement of Facts accepts that Gerstein "was not equipped with any type of recording device on that occasion."

*has been printed, or which may be prepared* by direction of the Secretary of the Treasury for the purpose of printing, any obligation or other security of the United States, uses such plate, stone, or other thing, or any part thereof, or knowingly suffers the same to be used for the purpose of printing any such or similar obligation or other security, or any part thereof, except as may be printed for the use of the United States by order of the proper officer thereof; .... (emphasis added).

At practically all stages of this case, the Government knew or could have easily known, as it later conceded, that the plates possessed by the appellant were "magic props," not counterfeiting plates, and were used by the appellant in his occupation as a professional magician. It was for this very reason that the Government voluntarily, though only eventually, dismissed the first count.[1] The prosecutor had fallen for the magic.

But the appellant suffered hurt and harm from this gullibility. Although he was arrested on the ninth day of May, 1980 on this charge and the indictment was returned on May 20, 1980, still, not until July 28, 1980— the first day of trial—did the Government dismiss the first count. Concededly, it did so because the plates were not *unlawfully* possessed by the appellant. The conduct prohibited by the terms of the statute does not embrace the possession of innocent magic props. The Government's attempt to apply the statute to such a possession infringes on appellant's ordinary freedom to own such props without being arraigned as a counterfeiter. Further, the obligations of the Government to the grand jury, as well as to the District Court, were breached. As the Chief Justice of the United States recently emphasized:

> The devastating consequences to an accused from the *very fact* of such an indictment is a matter which responsible prosecutors must weigh carefully.[2]

## II

The keynote infirmity appears again in the conviction of the appellant of the criminal conspiracy.[3] Of course, the appellant acted with and to the same end as, his friend Sparrow; indeed, they did so by agreement. True, too, the pair spoke of it as a "conspiracy." But an agreement and joint conduct—even if termed by the two a conspiracy—without more, is not criminal or a crime. A conspiracy to counterfeit requires the agreement of two or more persons to make a Government security with intent to defraud. On the facts of this case the Government simply has not proved the existence of an unlawful agreement. At most, appellant and Sparrow agreed only *to consider* the possibility of counterfeiting Federal Reserve Notes or *to inquire* as to the procurability of materials for counterfeiting. Since an agreement to consider or explore the commission of an act which would be an offense against the United States is not itself unlawful, no crime can be found.

Because I believe that there is no unlawful agreement it is unnecessary to consider the question of appellant's subsequent conduct. But even if, for the purpose of argument, I assume the existence of an agreement, no criminality is to be found in the conduct of the appellant. His was a series of inquiries and explanations, none of them pursued with positive action in any degree whatsoever. The articles, wares, services or

---

1. Incidentally, Sparrow had a pair of magic plates like Molovinsky's as the Government knew, and he had a magician's $5.00 bill, but he was not prosecuted for possession of either of them.

2. *United States v. MacDonald,* —— U.S. ——, —— n.12, 102 S.Ct. 1497, 1503 n.12, 71 L.Ed.2d 696 (1982).

3. 18 U.S.C. § 371. Conspiracy to commit offense or to defraud United States.

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

advice were the subject only of conversations by the appellant; they were never ordered or possessed by, or reserved for, him. Indeed, the totality of them would not have enabled him to counterfeit Federal Reserve Notes. These questionings, whether considered separately or as an entirety, were simply hypothetical and had never been actuated for a moment before or at the time of appellant's arrest. Hence he was not taken into custody on substantive hypotheses.

However, if his conduct manifested preparations and thus are treated as actualities, still no case was made for arrest, for, concededly, the utilization of all or any portion of them together, even including a printing press, would not provide a means of counterfeiting. Confessedly Molovinsky and his associate Sparrow each owned magic plates. But plates adaptable to counterfeiting—the very integral and essential tools of the crime—were never had by the appellant. Nevertheless, the possession of fake plates has been accorded an implication in the present prosecution as possible evidence of guilt. Thus the infirmity which dictated dismissal of the first count has infected the second.

The absence of any criminality in the conduct of Molovinsky is emphatically evinced in his demeanor. His actions and aims were not kept secret, but rather almost publicly proclaimed. They were frequently and fully revealed in eight of the instances listed in the majority opinion as evidencing crime—those when and where he inquired about methods, means and materials. Surely this is not behavior incident to a crime demanding secrecy for successful perpetration as does counterfeiting. Molovinsky's fault was stupidity not criminality.

It cannot be successfully argued that the inquiries by Molovinsky and Sparrow were overt acts towards execution of a criminal conspiracy, since there was no crime in being or in actuality. Simply put, the Government has failed to adduce evidence adequate to prove even a semblance of a criminal conspiracy. To me, the determination of the Government to prosecute was

unwarranted, the utter sparsity of the evidence confirming this conclusion. For these reasons appellant's imprisonment deeply concerns me. I would reverse the conviction.