**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4199**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

MONCLAIRE SAINT LOUIS, a/k/a Montclaire Saint Louis, a/k/a Top, a/k/a Top M.S.T.,

Defendant – Appellant.

**No. 17-4200**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ULRISTE TULIN, a/k/a Blade,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:15-cr-00173-LO-1; 1:15-cr-00173-LO-2)

Argued: January 25, 2018                    Decided: May 2, 2018

Before MOTZ and DIAZ, Circuit Judges, and Robert J. CONRAD, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

————————

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge Conrad joined.

————————

**ARGUED:** Vernida Rochelle Chaney, CHANEY LAW FIRM PLLC, Fairfax, Virginia, for Appellant Ulriste Tulin. Nader Hasan, LAW OFFICE OF NADER HASAN, PC, Fairfax, Virginia, for Appellant Monclaire Saint Louis. Ronald Leonard Walutes, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, United States Attorney, Joseph Attias, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

————————

DIAZ, Circuit Judge:

Monclaire Saint Louis and Ulriste Tulin are Haitian nationals whose involvement in the kidnappings of two Americans in Haiti during the summer of 2012 landed them in federal court in Alexandria. They were convicted at trial and now appeal. Although we agree with the district court's observation that "[i]t certainly was not a perfect trial," J.A. 1080, the issues raised by Saint Louis and Tulin ultimately do not warrant reversal. For the reasons explained below, we affirm.

## I.

### A.

In early June 2012, Yvroseline Fergile, a U.S. citizen, was kidnapped in Haiti. A group of men forced her at gunpoint into her car, beat her severely, and drove her to a house where they held her for seven days before she escaped. While in captivity, Fergile was able to speak with and see her kidnappers.

After Fergile escaped, Haitian police showed her a poster of a rap group, "Misyon Skwad," that was recovered during their search of the house where she was held. Fergile identified two individuals in the poster who she claimed were involved in her kidnapping: (1) defendant Saint Louis, also known as "Top," who was pictured in the poster next to the name "Top M.S.T," and (2) an individual identified as "Kwason" in the poster. Defendant Tulin was also pictured in the poster (shown with the nickname "Blade"), but Fergile did not identify him.

3

Later that summer, Ariante Marcelin—also a U.S. citizen—was abducted from her home at gunpoint by a group of men. One of the men assaulted and raped Marcelin's niece, who was at Marcelin's home when the kidnapping occurred. The men held Marcelin for four days. She was freed after one of her captors, Samson Jolibois, was arrested and led police to the house where she was being held. Jolibois implicated Saint Louis in the kidnapping, and police arrested Saint Louis later that day.

Several weeks later, FBI agent Alfred Watson traveled to Haiti to investigate the Marcelin kidnapping. After arriving in Haiti, Watson learned of Fergile's kidnapping and also began investigating that matter. Watson interviewed Jolibois, who told him that he, Saint Louis, and Tulin were among Fergile's kidnappers.

In mid-September 2012—approximately three months after Fergile's kidnapping—Watson interviewed Fergile in New York. He showed her three separate six-person photo arrays and asked if she recognized anyone. The first array contained a photo of Jolibois, which the FBI took while he was in Haitian custody. Fergile was unable to identify Jolibois. The second array contained a photo of Saint Louis, also taken by the FBI while he was in Haitian custody. Fergile identified Saint Louis, and added that she remembered that during the kidnapping, he had bragged about driving the vehicle.

The third array contained a photo of Tulin, which had been extracted from a scanned image of the "Misyon Skwad" rap poster that Haitian authorities had previously shown Fergile. Tulin was not in custody in Haiti when the FBI prepared the array, and the rap poster photo of Tulin was the only one the FBI had available. Tulin's photo was dark, appeared blurry, and showed a jagged, pixelated border from having been cropped and

4

lifted from the rap poster.  The other five filler photos showed individuals with hairstyles similar to Tulin's, and several were taken against a dark background and had rough, pixelated borders to make them appear cropped.

Fergile identified Tulin in the array.  She recalled that Tulin had told her that he needed money because he was poor and she was rich.  Fergile also told Watson that the Haitian police had shown her a rap poster and that Tulin's photo had been in the poster.

B.

Saint Louis and Tulin were each charged with conspiracy and two substantive counts of hostage-taking under 18 U.S.C. § 1203 and use of a firearm during a crime of violence under 18 U.S.C. § 924.  They were tried together in December 2016.  We briefly recount the events surrounding each of the issues they raise on appeal.

1.

Before trial, Tulin sought to suppress all identification evidence and testimony related to Fergile's identification of him in the FBI's photo array.  He argued that the array was unnecessarily suggestive and violated due process because (1) it recycled Tulin's photo from the rap poster that Fergile had already seen in Haiti in a suggestive show-up procedure, and (2) Tulin's photo was darker and of a lower quality compared to the others in the array.  The district court denied the motion, concluding that the array was not unduly suggestive.  But the court noted that it would revisit the issue after Fergile testified at trial.

At trial, Fergile failed to identify Tulin in the courtroom.  She could recall only that she had identified two individuals when Watson showed her the three photo arrays over four years earlier.  She also confirmed that she had identified only Saint Louis and Kwason

5

in the rap poster just after her escape. Nonetheless, evidence of Fergile's later identification of Tulin came in through Agent Watson's testimony.

At the close of the government's case and in a later motion for a new trial, Tulin again asked the district court to exclude evidence of Fergile's identification. The court denied both motions based on its view that the photo arrays were done "professionally" and "resulted in the identification of Mr. Tulin." J.A. 1116.

### 2.

Saint Louis and Tulin moved in limine to exclude evidence relating to the rape of Marcelin's niece. Instead of excluding the evidence entirely, the court ruled that it would only allow testimony that Marcelin's niece was assaulted, without reference to the sexual nature of the incident. But when Jolibois testified at trial, he let slip that one of the kidnappers had raped Marcelin's niece. J.A. 658. The district court struck the answer, instructed the jury not to consider it, and denied the defendants' subsequent motion to declare a mistrial. Then, on cross-examination, Jolibois mentioned that the perpetrator was "pulling up his pants." J.A. 685. The district court struck this answer, too. Before the jurors retired, the district court instructed them to disregard the stricken testimony and reminded them that "[t]he defendants are not on trial for any act or any conduct not specifically charged in the indictment." J.A. 775.

### 3.

Marcelin testified for the government, recounting her experience as a kidnapping victim. She confirmed (corroborating Jolibois's testimony) that she knew Tulin personally because she had employed him as a security guard at her home. According to Tulin,

6

Marcelin waved and smiled at him as she stepped down from the witness stand after testifying. Tulin's counsel sought to mention Marcelin's alleged conduct in her closing argument as evidence favorable to her client, but the district court refused, calling any such reference "purely speculation" and "prejudicial to the Government." J.A. 749.

4.

During closing arguments, Tulin's counsel speculated about the existence of cell phone records not in evidence that would have shown where Tulin was after the kidnappings, and questioned why the government failed to present such evidence. In rebuttal, the government observed that the defense could have presented that evidence, if it existed and was so important to the trial. The government immediately clarified that it bore the burden of proving the case beyond a reasonable doubt, not the defense. Counsel for Saint Louis objected to the government's remarks.

5.

The jury convicted Saint Louis and Tulin on all counts. Tulin moved for a new trial based on the weight of the evidence, arguing that, without Fergile's identification of him, his conviction could not possibly rest on the thoroughly impeached testimony of the government's cooperator, Jolibois.

Tulin also moved for a new trial based on the issues he and Saint Louis had raised earlier, including the introduction of identification evidence, the court's limitation on Tulin's counsel's closing argument, the introduction of prejudicial sexual assault testimony, and the government's burden-shifting arguments during closing. Saint Louis

7

moved for a new trial based only on the introduction of the sexual assault testimony. The district court denied both motions.

6.

Saint Louis and Tulin were each sentenced to 240 months in prison. At the sentencing hearing, Tulin objected to a two-level guidelines enhancement he received for causing serious bodily injury, arguing that Fergile's injuries were not of a serious nature. The district court overruled the objection, finding ample factual support for the enhancement.

II.

On appeal, Tulin argues that (1) the district court erred in refusing to suppress evidence of Fergile's out-of-court identification of him; (2) the introduction of prejudicial sexual assault testimony requires a new trial; (3) the district court's ruling preventing counsel from commenting on a witness's demeanor violated Tulin's rights under the Confrontation Clause; (4) the prosecutor's burden-shifting comment during closing denied him a fair trial; (5) the district court erred in determining that the weight of the evidence did not warrant a new trial; and (6) the two-level sentencing enhancement for inflicting serious bodily injury was improper. Saint Louis joins Tulin as to the second issue only. We consider each argument in turn.

A.

Tulin contends that the district court erred in denying his motion to suppress Fergile's out-of-court identification of him, which was admitted via Agent Watson's

8

testimony. He argues that his right to due process was violated because the FBI's photo array was impermissibly suggestive, which in turn resulted in an unreliable identification.[1] We review de novo the district court's legal conclusion as to whether the identification violated the Due Process Clause. *United States v. Saunders*, 501 F.3d 384, 389 (4th Cir. 2007).

Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Put differently, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012). Yet even where unnecessarily suggestive procedures are used, due process does not require exclusion of the evidence if the "identification was sufficiently reliable to preclude the substantial likelihood of misidentification." *United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997). Thus, our analysis proceeds in two steps: (1) "the defendant must show that the photo identification procedure was impermissibly suggestive," and (2) "if the

---

[1] Tulin also argues that Watson's testimony about Fergile's identification should have been excluded as hearsay. That is not correct. Fed. R. Evid. 801(d)(1)(C) provides that an out-of-court statement that "identifies a person as someone the declarant perceived earlier" is "not hearsay" as long as "[t]he declarant testifies and is subject to cross-examination about [the] statement." Because Fergile testified and was available for cross, Watson's testimony was not hearsay.

defendant meets this burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances." *Saunders*, 501 F.3d at 389–90.

Tulin argues first that his photo suggestively stood out in the array because it was darker and blurrier than the others. Although Tulin is right that his photo was dark and blurry, it didn't look "strikingly different" from the five filler photos in a way that would implicate due process concerns. *Cf. id.* at 390 (finding suggestiveness where defendant's photo "stood out sharply from the others in the array"). Rather, the FBI did an acceptable job creating a photo array that contained similar-looking photos. The headshot of Tulin that was lifted from the rap poster was cropped so that it showed only his head and neck against a dark background, removing any indication of the context of the rap poster that might have been gleaned from including Tulin's clothing or the text from the original image. Further, Tulin's neutral expression in the photo is similar to those of the individuals pictured alongside him in the array. The filler photos show men of similar age, build, and complexion, with similar hairstyles. Several of the photos were also cropped and set against dark backgrounds. And, as the district court noted, at least one other photo had the "same kind of glossy look to it as Mr. Tulin's." J.A. 312.

Tulin also contends that the FBI's use of his photo from the rap poster that was shown to Fergile a few months earlier by Haitian police impermissibly suggested to Fergile that she should select Tulin's photo from the array. But an array is not unduly suggestive merely because it includes a photo of the suspect that the witness has already seen. *See United States v. Maguire*, 918 F.2d 254, 263 (1st Cir. 1990) ("A suspect's inclusion in two photospreads, even with the same photo, is not constitutionally impermissible.").

In *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992), for example, the Second Circuit found no suggestiveness in the use of a suspect's photo in multiple arrays. In that case, a witness was shown an array of mugshots including the suspect and five others, but the witness was unable to select the suspect from the spread. 983 F.2d at 378. When presented with a second photo array, which also included the suspect's photograph, the witness selected the suspect's picture after studying the array for half an hour. *Id.* The court there concluded that "the fact that a suspect's picture was placed in a second array after a witness has failed to select anyone from the first array [does not] automatically make the second array unduly suggestive." *Id.* at 379.[2]

We think the same can be said of the use of Tulin's photo from the rap poster in the FBI's photo array. But even assuming that the array was impermissibly suggestive, Fergile's identification of Tulin in the photo array was nonetheless reliable.

We evaluate reliability considering the totality of the circumstances, including factors such as: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior

---

[2] In *Concepcion*, the defendant challenged a witness's in-court identification of him, claiming it was tainted by suggestive pretrial procedures. 983 F.2d at 377. Normally, a court's analysis of the admissibility of an identification ends when it finds no suggestiveness, *see Fowler v. Joyner*, 753 F.3d 446, 458 (4th Cir. 2014), but in *Concepcion* the witness was also unable to identify the defendant at a hearing held during trial outside the presence of the jury. 983 F.2d at 378. Based on this intervening circumstance, the Second Circuit found the witness's pretrial identifications insufficiently reliable to permit the witness to identify the defendant at trial. *Id.* at 379. In contrast, our task here is limited to passing on the admissibility of Fergile's out-of-court identification of Tulin based on the September 2012 photo array.

description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200. We weigh these factors against "the corrupting effect of the suggestive identification itself," *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), keeping in mind that "the exclusion of such evidence is the exception to the rule that favors the admissibility of eyewitness identification for the jury's consideration." *Fowler v. Joyner*, 753 F.3d 446, 453 (4th Cir. 2014).

Here, the first and second factors—the witness's opportunity to view the criminal and her degree of attention at the time of the crime—strongly support a finding of reliability. Fergile was able to see her captors and speak with them during the seven days she was held. She was also able to recall specific details about her captivity, showing a high degree of attention during that time. Meanwhile, the third factor—the accuracy of any prior description of the criminal—doesn't assist our analysis here because Watson didn't ask Fergile to describe Tulin before he showed her the photo array.

With respect to the fourth factor (the witness's level of certainty at the confrontation), Fergile showed a high level of certainty when she picked Tulin's photo from the array. Watson's interview report noted that she "positively identified" Tulin and that she went on to offer additional information about him, including his role in the kidnapping and statements he made to her during her captivity. J.A. 88. Although we are mindful that a "lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor," *United States v. Jones*, 689 F.3d 12,

12

18 (1st Cir. 2012), we find that this factor tilts slightly in favor of reliability under these circumstances.

Finally, the fifth factor—the length of time between the crime and the confrontation—does not support reliability here. In *Biggers*, the Supreme Court found an identification reliable where seven months had elapsed between the crime and the confrontation. 409 U.S. at 201. The Court there noted that such a lengthy time period would be "a seriously negative factor in most cases," but it credited the witness's record for reliability because she had made no identifications at previous show-ups, lineups, or photographic showings, despite their suggestiveness. *Id.*

In this case, we have a more complicated scenario. Fergile's record for reliability was not the best. She identified Saint Louis and Kwason in the initial show-up in Haiti on the day of the crime, but not Tulin. Then, three months later, she picked Tulin from a photo array but failed to identify another of her captors, Jolibois, in a different array. And at trial, in the most suggestive of circumstances (albeit four years later), she was unable to identify Tulin in the courtroom.

While the length of time between the crime and pretrial identification here (three months) is less than in *Biggers*, it is still longer than many cases in which the passage of time has been found to support reliability. *See United States v. Lewis*, No. 16-4680, 2018 WL 1073624, at *6 (4th Cir. Feb. 27, 2018) (four hours); *Saunders*, 501 F.3d at 392 (two hours); *Brathwaite*, 432 U.S. at 116 (two days). We can't say with certainty that the three-month time period here supports reliability under the circumstances.

13

Weighing all of these factors together against the corrupting effect of the FBI's photo array, we conclude that Fergile's identification of Tulin was reliable and thus the district court did not err in admitting the evidence. We also note that even when law enforcement uses an unnecessarily suggestive procedure, "suppression of the resulting identification is not the inevitable consequence." *Perry*, 565 U.S. at 239. Rather, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.* at 237.

Tulin had that opportunity in spades. Fergile was cross-examined about her identifications, and Tulin's counsel elicited that Fergile did not identify Tulin in the show-up of the rap poster in Haiti. Tulin's counsel also cross-examined Agent Watson vigorously, asking probing questions about the suggestiveness of the array and the reliability of Fergile's positive identification. Furthermore, Fergile's flaws as a witness were on full display at trial. The jury heard that she had a poor recollection of the photo identifications she had made four years earlier and saw her fail to identify Tulin in the courtroom. The district court also instructed the jury at length about identification evidence, noting that "[o]ne of the most important issues in this case is the identification of the defendants," and that "if you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty." J.A. 782. Certainly, the "safeguards built into our adversary system that caution

juries against placing undue weight on eyewitness testimony of questionable reliability," *Perry*, 565 U.S. at 245, were present here.

Where, as in this case, an admittedly imperfect photo identification procedure isn't unduly suggestive and the witness's identification shows key indicia of reliability, we are "content to rely upon the good sense and judgment of [the jury], for evidence with some element of untrustworthiness is customary grist for the jury mill." *Brathwaite*, 432 U.S. at 116. We therefore affirm the district court's decision to admit the pretrial identification evidence.

B.

Both Tulin and Saint Louis contend that the district court erred in denying their motions for a mistrial (and later, a new trial) based on the introduction of testimony about a rape committed by someone else during Marcelin's kidnapping. We review a district court's denial of a motion for a mistrial and for a new trial for abuse of discretion. *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008); *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). An abuse of discretion exists if the defendant can show prejudice; "no prejudice exists, however, if the jury could make individual guilt determinations by following the court's cautionary instructions." *Wallace*, 515 F.3d at 330 (internal quotation marks omitted). When cautionary instructions are given, "[w]e presume that juries follow such instructions." *United States v. Johnson*, 587 F.3d 625, 631 (4th Cir. 2009).

These well-established principles show that the district court was right to deny Tulin's and Saint Louis's motions for a mistrial. In response to the inadvertent admission

of potentially prejudicial remarks from Jolibois, the district court promptly struck the testimony and instructed the jury to ignore it. We also note that the district court, with the benefit of contemporaneous observation, was not convinced that the jury heard the first remark because the prosecutor immediately and loudly interjected with the word "assaulted" as Jolibois (testifying through an interpreter) said, "raped." J.A. 658, 664. What's more, the government then went out of its way to elicit testimony that Saint Louis and Tulin were not involved in the "assault" and had condemned the act.[3]

More importantly, because we presume juries follow the kinds of curative instructions given by the district court here, Tulin and Saint Louis cannot show prejudice. *See United States v. Dorsey*, 45 F.3d 809, 818 (4th Cir. 1995) (finding no prejudice where "the district court's curative instructions properly informed the jury of the types of evidence that they should and should not consider in reaching its verdict").

### C.

Tulin next asserts that the district court violated his rights under the Confrontation Clause when it barred his lawyer from commenting on the demeanor of a witness during closing argument. Specifically, Tulin argues that the court was wrong to prohibit counsel from highlighting Marcelin's alleged wave and smile at Tulin as she left the witness stand

---

[3] We recognize that this additional testimony may have been a two-edged sword in that it further emphasized the improper evidence. Nonetheless, we cannot say that the district court erred in denying the defendants' request for a mistrial based in part on this fact.

16

after her testimony. We review an alleged Confrontation Clause violation de novo. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015).

The Sixth Amendment affords a criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right to confrontation "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (internal quotation marks omitted).

The district court's decision to limit counsel's closing argument did not deny Tulin either of these protections. During trial, Tulin was able to physically face Marcelin and he was able to cross-examine her about her testimony. We therefore reject Tulin's Confrontation Clause argument.

## D.

Tulin also complains about the government's closing argument. During closing, the government made comments suggesting that Tulin failed to present evidence to the jury. These comments were made in response to Tulin's argument speculating about the absence of phone records in the government's case. Specifically, the government said, "What evidence that exists on a physical level is available to both parties. Why didn't [Tulin's counsel] introduce it? She doesn't bear the burden, I do, but my point is, understand the context." J.A. 874. Tulin says the district court erred when it did not take curative measures after an objection was raised to these remarks, denying him a fair trial.

17

We review a trial court's rulings on objections to closing arguments for abuse of discretion. *United States v. Green*, 599 F.3d 360, 379 (4th Cir. 2010).[4] "In determining whether a defendant's due process rights were violated by a prosecutor's closing argument, we consider (1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010).

It is well established that "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). Yet "[w]e have previously held that the government may respond to a defendant's argument that the failure to call a witness weakens the government's case by noting that the defendant could also have called the witness." *United States v. Walker*, 191 F. App'x 205, 208 (4th Cir. 2006) (unpublished) (citing *United States v. Molovinsky*, 688 F.2d 243, 247 (4th Cir. 1982)).

In *Molovinsky*, defense counsel commented to the jury about the government's failure to call a witness, and the government responded by arguing that the witness "was at least as available to the defense as he was to the Government." 688 F.2d at 247. We found

---

[4] The government says we should review this issue for plain error because only counsel for Saint Louis, not Tulin, objected at trial. Generally, "when one codefendant objects and thereby brings the matter to the attention of the court, further objections by other defendants are unnecessary." *See United States v. Brown*, 562 F.2d 1144, 1147 (9th Cir. 1977). Regardless, we need not resolve this issue because Tulin's claim fails under either standard.

this to be a "justified defensive response" by the government and thus saw no error in the district court's view that the response was appropriate in light of the statement made by defense counsel. *Id.* So too here.

But even if the remarks were improper, Tulin cannot show prejudice. In determining prejudice, we consider (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. *Lighty*, 616 F.3d at 361.

Here, the prosecutor's remarks were isolated and made only to counter the argument of defense counsel, not to divert the jury's attention. Furthermore, the comments did nothing to alter the strength of the proof before the jury, and the prosecutor's immediate clarification that "[Tulin's counsel] doesn't bear the burden, I do," mitigated any potential that the jury would be misled. Accordingly, we reject Tulin's claim of error.

E.

Next, Tulin appeals the denial of his motion for a new trial under Fed. R. Crim. P. 33 based on the weight of the evidence, which we review for abuse of discretion. *Arrington*, 757 F.2d at 1486. A district court should grant a new trial based on the weight of the evidence "only when the evidence weighs heavily against the verdict." *Id.* When considering the motion, the district court is not required to view the evidence in the light

19

most favorable to the government, and it may evaluate the credibility of witnesses. *Id.* at 1485.

In denying Tulin's motion, the district court credited Fergile's identification of Tulin and noted that, despite some effective impeachment, Jolibois's testimony for the government was "compelling." J.A. 1116. Jolibois accepted responsibility for his role in each abduction and identified both Saint Louis and Tulin as part of the group of perpetrators. He testified that Tulin used a .45 caliber handgun during the first kidnapping, and that Tulin grabbed Fergile and put her into the car to be taken to Jolibois's house, where she was held. Jolibois also recounted how Tulin was responsible for the plan that led to Marcelin's kidnapping, because Tulin knew Marcelin personally and was aware that she was bringing a large sum of money to Haiti from the United States to help build a hospital. When they could not locate the money in Marcelin's home, Tulin decided they would kidnap Marcelin instead and hold her for ransom. In all, Jolibois's testimony shows the evidence did not weigh against the jury's verdict. Under our deferential standard of review, we affirm the court's decision to deny Tulin a new trial.

F.

At sentencing, the district court overruled Tulin's objection to a two-level enhancement for serious bodily injury (defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation"). *See* U.S.S.G. § 2A4.1(b)(2)(B); § 1B1.1 app. n.1(L). Tulin says this was

20

wrong because he believes the injuries sustained by Fergile did not rise to the level of "serious bodily injury." We disagree.

We review a sentence imposed by the district court "under a deferential abuse-of-discretion standard." *United States v. Evans*, 526 F.3d 155, 161 (4th Cir. 2008). In reviewing guideline determinations, we review questions of law de novo, and questions of fact for clear error. *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).

Here, the facts surrounding Fergile's kidnapping certainly support the sentencing enhancement Tulin received. Both Fergile and Jolibois testified that Fergile was beaten extensively by her captors, especially around her face. Fergile's injuries from those beatings included a broken blood vessel in her eye and bleeding from her arm and nose.

We think the district court correctly found these injuries sufficiently "serious." J.A. 1120. Tulin argues otherwise because Fergile did not seek out medical intervention and did not suffer protracted impairment of her eye, but these contentions critically overlook the very first part of the definition of "serious bodily injury": that which causes "extreme physical pain." We find no error—clear or otherwise—in the district court's decision to apply the enhancement.

III.

For the reasons given, the judgment of the district court is

*AFFIRMED*.

21